**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

2010 JAN 29  PM 4: 42

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY

| | |
|---|---|
| STEVEN B. AUBREY and<br>BRIAN E. VODICKA<br><br>Plaintiffs,<br><br>v.<br><br>PETER E. BARLIN,<br>GREGORY H. LAHR,<br>SANDRA F. GUNN,<br>MARK E. SCHIFFGENS,<br>MITCHELL D. SAVRICK, and<br>SAVRICK SCHUMANN JOHNSON McGARR<br>KAMINSKI & SHIRLEY, LLP,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

No. **A 1 0 C A 0 7 6   SS**

## ORIGINAL COMPLAINT

Plaintiffs, Steven B. Aubrey ("Aubrey") and Brian E. Vodicka ("Vodicka"), file this Original Complaint against Defendants, Peter E. Barlin ("Barlin"), Gregory H. Lahr, ("Lahr"), Sandra F. Gunn ("Gunn"), Mark E. Schiffgens ("Schiffgens"), Mitchell D. Savrick ("Savrick"), and Savrick Schumann Johnson McGarr Kaminski & Shirley, LLP (the "Savrick Firm").

## I. INTRODUCTION

1.      Defendants defrauded Plaintiffs and others through the promotion and sale of investment interests in real estate secured loans.  Defendants operated a mortgage fraud scam that involved systematic misrepresentations and omissions, diversion of investor funds, use of shell companies, mortgage flipping, tax fraud,

creation of fraudulent liens, paying secret kickbacks to promoters of the scam, and several other dishonest, illegal, and fraudulent acts.

## II. PARTIES

2.      Aubrey is a resident of Travis County, Texas.

3.      Vodicka is a resident of Travis County, Texas.

4.      Barlin is a resident of Travis County, Texas and may be served with process at his residence, 3306 Windsor Road, Austin, Texas 78703, or wherever he may be found.

5.      Lahr is a domiciliary of Long Beach, California but may be served at his Texas residence, 3306 Windsor Road, Austin, Texas 78703, or wherever he may be found.

6.      Gunn is a resident of Travis County, Texas and may be served with process at her residence, 17 Rob Roy Rd., Austin, Texas 78746, or wherever she may be found.

7.      Schiffgens is a resident of Travis County, Texas and may be served with process at his residence, 2506 Roxmoor Dr., Austin, Texas 78723, or wherever he may be found.

8.      Savrick is a resident of Travis County, Texas and may be served with process at his place of business, 4330 Gaines Ranch Loop, Suite 150, Austin, Texas 78735, or wherever he may be found.

9.      The Savrick Firm is a limited liability partnership formed under Texas law and may be served with process through its partner, Mitchell D. Savrick, at its office, 4330 Gaines Ranch Loop, Suite 150, Austin, Texas 78735.

### III.  JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action asserting claims based on federal law.  In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1367 because Plaintiffs' state-law claims are so related to the federal claims in this action that they form part of the same case or controversy.

11.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district.  Venue for Plaintiffs' civil RICO claim is additionally proper under 18 U.S.C. § 1965 because each Defendant resides, is found, or transacts his or her affairs in this district.

### IV.  FACTS

The Capital Advantage Loan Scam

12.     On June 7, 2000, Lahr and Lisa Caufmann formed CA Operations, LLC d/b/a Capital Advantage, a Texas limited liability company.  Lahr controlled and used Capital Advantage to promote, package, and sell investments in real estate secured loans, promising annual returns of 14% to 18% interest.  Capital Advantage lasted only three years because it was an investment scam with the following features: (1) title insurance policies were not obtained to protect investors; (2) liens were not filed or perfected on property that was supposed to secure loans; (3) no due diligence was performed by the managers of Capital Advantage or the attorneys hired by Capital Advantage to represent and protect the investors in the loan transactions; (4) false property appraisals were used; and (5) money invested in the loans was diverted, misappropriated, and used to pay interest to earlier investors.

Page 3 of 48

13.     Barlin participated in the Capital Advantage scam as an investor. Specifically, Barlin invested $150,000 on April 1, 2000 in a Capital Advantage loan to Paul and Stephanie Dunn.  In January 2001, Barlin invested $145,000 in a Capital Advantage loan to Six Flags Mall, LP.  Defendant Sandra Gunn also participated in the Capital Advantage scam.  From 2000 to 2002, Gunn invested in at least seven Capital Advantage loans, often with a group of investors who pooled their funds.

14.     Lahr not only orchestrated the Capital Advantage scam, but also participated as a borrower.  From 2001 to 2002, Lahr and a company called Advantage Builders, LLC were the borrowers in at least eight Capital Advantage loans.  Advantage Builders, LLC was owned and controlled by Lahr.  Schiffgens, a certified public accountant, also participated in the Capital Advantage scam as a borrower.  On September 5, 2001, Schiffgens and his accounting firm received loans totaling $275,000 from Capital Advantage.

15.     In 2003, many victims of the scam, including Gunn, sued Capital Advantage, Advantage Builders, LLC, the law firm of Hilgers & Watkins, P.C. and others for fraud, breach of fiduciary duty, and violations of the Texas Securities Act.  Gunn's lawsuit was: *Gunn v. CA Operations, LLC, et al.*, Cause No. 300671, in the 250th District Court of Travis County, Texas.  At least six other lawsuits were filed against Capital Advantage, Advantage Builders, LLC and/or Lahr.  Ultimately, Hilgers & Watkins, P.C. settled the lawsuits for $5 million.  The multiple suits and settlements concerning the Capital Advantage scam generated articles in the Austin-American Statesman and the Texas Lawyer, and resulted in significant adverse publicity to Capital Advantage.

16.     Lahr ceased doing business in Texas through CA Operations, LLC, but he continued to broker real estate secured loans in California using the name Capital Advantage, through a Nevada corporation called Capital Advantage, Inc. ("CA"), which Lahr had formed on August 18, 1994.  It was not long, however, before Lahr resumed operations in Texas under new names.  Lahr, Gunn, and Schiffgens agreed to form new entities to promote the sale of real estate secured loans in Texas.  On October 26, 2005, Gunn formed CFS Associates, Inc. d/b/a Creative Financial Solutions, a Texas corporation ("CFS").  On November 14, 2005, Schiffgens formed Creative Lending Concepts, LLC, a Texas limited liability company ("CLC").  Upon information and belief, CFS and CLC were Lahr's shell companies.  CFS never had an office, employees, or assets.  Gunn served as its president and maintained the company's business records at her home.  CLC never had any employees or assets.  Schiffgens served as its president and kept all of its records at his office.  At all relevant times, Lahr controlled CFS, CLC, and CA.  Schiffgens was Lahr's accountant.  Although CFS was based in Texas, it solicited and/or provided services to investors outside Texas and solicited and/or provided services to borrowers outside Texas.

17.     The Capital Advantage loan scam had used the firm Hilgers & Watkins, P.C. to prepare all legal documents for the loan transactions.  The rebirth of Lahr in Texas would require a new law firm.  Savrick and the Savrick Firm, (collectively, "Savrick") would fulfill that role.  Surprisingly, Savrick agreed to prepare all necessary loan documents for Lahr, Gunn, and CFS and impermissibly agreed to represent both the investors and CFS in all the loan transactions.

Initial Meeting and Joint Investment Presentations

18.     Barlin was a longtime friend and financial advisor to Vodicka.   Barlin started supplying trusted guidance to Vodicka, and making joint investments with him, in 1988.  In February 2005, Vodicka once again turned to Barlin for advice.  As he had done before, Barlin invited Plaintiffs to his home in Austin, Texas.  That evening, Barlin introduced Plaintiffs to Lahr.  Barlin and Lahr made a joint investment presentation to Plaintiffs, encouraging Plaintiffs to invest in real estate secured loans through Lahr. Barlin and Lahr made at least four such presentations to Plaintiffs over a two-year period.  Barlin and Lahr stated that they could assess risk in real estate investments better than Plaintiffs could, and encouraged Plaintiffs to rely on their judgment.  Barlin and Lahr made each of the following statements to Plaintiffs in person at Barlin's home:

- Lahr is the most honest person I know and you can trust him;

- Lahr is completely trustworthy and dependable;

- Lahr is above board in all of his business dealings;

- The safest and most secure way to invest your money is with Lahr;

- Not one of Lahr's investors has ever lost money – "never lost a nickel" – on any Lahr investments;

- Some of Lahr's investors have been with him for twenty years because he always looks out for their interests;

- Barlin's sister invested with Lahr and gets her checks "like clockwork";

- Lahr has a proven track record of success in business dealings and activities and the return on an investment with Greg Lahr is "like mailbox money, so you can sleep at night";

- Lahr's investors have total confidence in him, uniformly are happy with him and supportive of him;

2828070.5

- The benefit of investing with Lahr is that he does all the research and "due diligence" so you don't have to worry about that;

- Nothing in the stock market can be as secure as investing with Lahr;

- Investments with Lahr generate a safe and secure retirement income without risking the loan principal;

- Lahr's loans are completely safe and each is secured by real property, a "hard asset" that you cannot get in the stock market

- Lahr's loans are secured by real property with a loan to value ratio capped at 65% for income producing property and 50% for undeveloped land

- Lahr's loans are properly documented by qualified real estate attorneys who represent and protect the investors.

19.     Barlin and Lahr concurred with each other as to each point, ratifying and affirming each statement.  However, Barlin and Lahr knew that these statements were false and materially misleading.  Barlin and Lahr knew of the scandalous history of fraud committed by Lahr and Capital Advantage, but they did not disclose that information to Plaintiffs.   Instead, they assured Plaintiffs that Lahr was trustworthy and that his investors had never lost any money.  Even Barlin's statement about his sister was not true.  Lahr has testified under oath that Barlin's sister, Heidi, invested in a CFS loan secured by property in Kyle, Texas; that the borrower defaulted; and "I foreclosed on the property, my retirement plan did, and I paid her off."  Barlin's statement about his sister was false and misleading, but neither Barlin nor Lahr corrected it or disclosed the truth to Plaintiffs.

20.     Further, Barlin and Lahr did not disclose their business relationship.  Lahr is domiciled in California but, for many years, and at all times relevant to this action, Lahr lived in Barlin's garage apartment when he was in Austin.  Lahr's driver's license still lists Barlin's home address.  Barlin considered Lahr to be part of his family, and Lahr

occasionally took care of Barlin's children.    Barlin and Lahr had been friends and business partners for twenty years.    Records from the Travis County Central Appraisal District show that Barlin and Lahr co-owned at least seven properties in Travis County. Most importantly, Barlin received secret kickbacks from Lahr for each investor and lender that Barlin referred to Lahr.    Barlin and Lahr never disclosed this arrangement to Plaintiffs.    Barlin had an undisclosed financial interest to induce Plaintiffs to invest with Lahr.

Plaintiffs Invest in the CFS Beaumont Loan

21.    In reliance on Barlin's and Lahr's representations and omissions, Plaintiffs made their first investment with Lahr on February 28, 2005.    Plaintiffs invested $125,000 in a CFS loan secured by property near Beaumont, Texas (the "CFS Beaumont Loan"). Plaintiffs wired $125,000.00 from their stock account at Ameritrade in Bellevue, Nevada to Bank of America in Dallas, Texas for deposit in an account registered to LandAmerica Commonwealth Title Co.

22.    The promissory note for the CFS Beaumont Loan reflects that CFS loaned a total of $1,125,000 to Lawrence and Brenda Barron.    Exhibit A to the promissory note reflects that Plaintiffs were among five others who participated in the CFS Beaumont Loan: (1) Lincoln Trust f/b/o Jorena Bennett; (2) Larry Chaney; (3) Kevin Miller; (4) Barlin; and (5) Eric Bateman.    According to Exhibit A, Barlin invested $200,000.

23.    Lahr, Gunn, CFS, and Savrick did not provide Plaintiffs with a copy of the HUD settlement statement for the CFS Beaumont Loan.    It was the business practice of those Defendants not to provide CFS investors with the settlement statements for loans, making it easy to hide fees and commissions from the investors.    Through prior

litigation, Plaintiffs obtained documents from Defendants and discovered that CFS created <u>two</u> HUD settlement statements for the CFS Beaumont Loan.  The first settlement statement (bates-labeled CFS 01245-46) is identical to the second settlement statement (bates-labeled MDS 02266) in nearly all respects, and both purport to be signed by the borrower.  However, the first statement lists Allan Craig as the settlement agent in box "H."  Allan Craig was indicted on November 9, 2004 (three months before the CFS Beaumont Loan) for flipping mortgages for profit.   On September 19, 2006, Craig was convicted under 18 U.S.C. §§ 2, 1349, for conspiracy to commit mail fraud, wire fraud, and bank fraud.  *See United States v. Craig*, Cause No. 04-CR-180-LY, in the U.S. District Court for the Western District of Texas, Austin Division (Yeakel, J., presiding).  The second settlement statement lists LandAmerica Commonwealth as the closing agent in box "H."  Upon information and belief, at some time, Savrick, Lahr, Gunn, and CFS caused a new settlement statement to be created for the same loan, and removed Allan Craig as the listed closing agent.

24.    The first HUD settlement statement (undisclosed to Plaintiffs at the time of the investment) shows that Defendant Barlin, at closing, received a "loan referral fee" of $625 (equal to 0.5% of Plaintiffs' $125,000 investment).   Through discovery in prior litigation, Plaintiffs have learned that CFS paid Barlin and others a commission to refer borrowers and investors to CFS.  With respect to the investors, CFS paid commissions equal to 0.5% of the amount invested.  Barlin received $625 for introducing Plaintiffs to Lahr and causing them to invest in the CFS Beaumont Loan.  This arrangement was never disclosed to Plaintiffs by Savrick, Barlin, Lahr, or the other Defendants.  Alan Craig, as escrow agent for the CFS Beaumont Loan, paid all fees shown on the HUD

settlement statement, including the first secret kickback that Barlin received from Plaintiffs' investments with Lahr.

25.     The rebirth of Lahr and Capital Advantage through Barlin, Gunn, CFS, and Savrick had begun.  To top it off, at the time of the CFS Beaumont Loan, CFS did not even legally exist.  CFS was not formed until October 26, 2005, eight months after the CFS Beaumont Loan.  However, that did not prevent Savrick, Gunn, and Lahr from executing all the loan documents for and on behalf of CFS.  Unfortunately, the fraudulent, unscrupulous, and grossly negligent practices of Lahr, Barlin, Gunn, and Savrick would be repeated and exacerbated in later transactions.

## Barlin and Lahr Cause Plaintiffs to Take Out a Home Equity Loan[1]

26.     In the latter half of April 2006 and the first week of May of 2006, Barlin and Lahr caused Plaintiffs to take out a home equity loan and invest the proceeds with Lahr. During this time, Barlin and Lahr continued to make joint investment presentations to Plaintiffs, telling them that investing with Lahr was a safe way for Plaintiffs to invest retirement savings and the proceeds of a home equity loan.  One meeting occurred at Barlin's home in Austin.  Another day, Lahr met with Plaintiffs at their home in Austin. Plaintiffs also spoke to Barlin by phone at least twice, and spoke to Lahr by phone at least four times.  For at least one of the calls, Lahr was in California.  In each discussion and meeting, Lahr and Barlin induced Plaintiffs to take out a home equity loan and to invest their money with Lahr.  Lahr and Barlin stated that interest rates would never be lower, and Plaintiffs would profit from the "spread" between the home equity lending rate and the 11% to 15% interest rate that Lahr got for his investors.

---

[1]  Defendants' practice of causing their investors to mortgage their homes was inflicted upon others as well, including CFS investors Ben and Ingrid Edwards and the late Jorena Bennett.

27.     On May 10, 2006, in reliance on the information and advice provided by Lahr and Barlin, Plaintiffs obtained a home equity loan of $650,000 from Colonial Bank Alabama, N.A.   On or about May 10, 2006, Lahr told Plaintiffs that he had several properties lined up for fully collateralized and secure deeds of trust, including one in Victorville, California, and suggested that Plaintiffs invest their home-equity money right away to start earning interest.   On May 11, 2006, Plaintiffs wired $500,000 of their home-equity money from Colonial Bank Alabama, N.A. to the First American Trust Company, in Santa Ana, California, to an account registered to First American Title Company.   This investment was for a CA loan in real property in Victorville, California. However, the loan did not close and, within two weeks of making the wire transfer, Plaintiffs' funds were returned.   As explained below, Plaintiffs invested those funds with Lahr in June 2006, in a CA loan secured by property at Six Flags Mall.

Plaintiffs Invest in the CFS Temple Loan

28.     On or about June 5, 2009, Lahr met with Plaintiffs in their home in Austin. At the meeting, Lahr recommended that Plaintiffs invest in a CFS loan secured by real property in Temple, Texas (the "CFS Temple Loan").   Lahr told Plaintiffs that: (1) the property consisted of newly renovated apartments, called the Nadine Apartments, located at 212 East Avenue A, Temple, Texas 76501; (2) all renovations were completed, but a few invoices from subcontractors remained outstanding, and part of Plaintiffs' investment would satisfy those remaining invoices; (3) except for payment of those invoices, Plaintiffs' funds will be used by the borrower to improve the property; (4) "the rents are ready to roll" on the Nadine Apartments; (5) the Nadine Apartments have an appraised value of $465,000; (6) the CFS Temple Loan would be a "safe investment"

for Plaintiffs; and (7) Lahr was doing a favor for Plaintiffs by giving up his position in the CFS Temple Loan and selling it to Plaintiffs, so that the money from their home equity loan would not remain idle and could start earning interest right away. All of these statements by Lahr were false.

29.     Lahr knew and failed to disclose that the Nadine Apartments were vacant, dilapidated, and in a state of such disrepair that they were clearly and obviously unfit for living. In fact, the Nadine Apartments did not even have a certificate of occupancy and, therefore, had no rental income. In addition, Lahr lied about the appraisal; there never was an appraisal of the Temple property for $465,000. On May 1, 2005, Chris P. Greisbach, a state certified real estate appraiser, inspected the Nadine Apartments. His report stated: "At present all of the units are vacant and the building is boarded up awaiting the start of proposed renovations. The building was constructed in 1925 and it is presently in need of extensive renovations." Mr. Greisbach estimated that the "as is" fee simple market value of the Nadine Apartments was $135,000. Lahr knew of the Greisbach appraisal, failed to disclose it to Plaintiffs, and falsely represented that the Nadine Apartments had been appraised for $465,000.

30.     Plaintiffs invested their funds in two transactions. First, on June 5, 2006, Aubrey wrote a check for $70,000 to Lahr, drawn on Colonial Bank, N.A. This amount was for the purchase of Lahr's interest in a CFS loan to Khaled Hassan Matin, also secured by the Nadine Apartments. Plaintiffs never met or had any dealings with Mr. Matin.

31.     On June 6, 2006, Lahr executed an "Assignment of Note and Lien Interest" to Vodicka without the knowledge of Plaintiffs. By way of the Assignment of

Note and Lien Interest, Lahr assigned Vodicka a promissory note executed by Mr. Matin, in favor of CFS, in the amount of $50,000, not $70,000. Lahr kept the difference, $20,000, and failed to invest it for Plaintiffs or disclose his actions to Plaintiffs.

32.     It was common for "new" CFS investors to pay-off and replace "old" CFS investors. Lahr, Gunn, Schiffgens, and Savrick flipped investors (often including Lahr and Barlin) in and out of loans because they collected fees each time an investor funded a CFS loan.   Gunn received a 15% commission on all "origination" fees collected by CFS.  Lahr received a 10% commission on all "origination" fees collected by CFS.  The remaining 75% was paid to the broker(s) who recruited the investor and borrower to the CFS loan.  Savrick collected document preparation fees.  Barlin referred Plaintiffs to Lahr, and collected referral fees and secret kickbacks each time he caused Plaintiffs to invest with Lahr and CFS.

33.     Lahr was only doing himself "a favor" by selling his interest in the CFS loan to Plaintiffs.  This was true not only because Lahr made a commission by flipping himself out of the loan, but also because he knew, but failed to disclose, that the borrower, Mr. Matin, had already defaulted on this as well as another previous and undisclosed CFS loan, and Lahr had not received at least two months of interest due on the note that he was assigning to Plaintiffs.  Savrick also knew of these facts, but failed to disclose them to Plaintiffs, who were his clients.  Before closing, Savrick prepared a report showing the terms of the loan, and noted therein a payment of $1,512.50 would be made to Lahr as "past due interest to Greg Lahr."  Defendants Lahr and Savrick knowingly flipped Plaintiffs into a defaulted loan and used Plaintiffs' money to pay past due interest to Defendant Lahr.  Had Plaintiffs known that Mr. Matin was in default on

both the current loan and another previous and undisclosed CFS loan, and that Lahr had not received at least two months of interest due on the note that he was assigning to Vodicka, Plaintiffs would not have invested their $70,000.

34.     The second part of Plaintiffs' investment in the CFS Temple Loan was accomplished on June 9, 2006. Plaintiffs wired $50,000 from Colonial Bank, N.A. to an account at Bank of America in New York City, which was registered to the title company, LandAmerica Commonwealth. The CFS Temple Loan closed on June 9, 2006. The HUD Settlement Statement for the CFS Temple Loan reflects that CFS served as the lender to Mr. Matin as borrower. Plaintiffs were among at least three other investors who participated in CFS loans to Mr. Matin secured by the Nadine Apartments. Lahr and an investor named Dovie J. Hayden Trust had invested before Plaintiffs, and investors named Ben and Ingrid Edwards invested after Plaintiffs.

35.     Several "fees" and "interest" payments are reflected on the HUD Settlement Statement for the CFS Temple Loan. The Statement shows, for example, that from Plaintiffs' $50,000 investment, Defendants compensated themselves as follows: (1) CFS took $3,005.00; (2) Lahr took $2,387.50; (3) Gunn took $595.00; and (4) the Savrick Firm took $595.00. An entity called "PWP Properties" got an "origination fee" of $1,995.00. Plaintiffs have no personal knowledge of that entity or its role in their investment in the CFS Temple Loan, but believe it is owned or controlled by Barlin and/or Lisa Caufmann. Discovery will be necessary to uncover the identity of PWP Properties and its relation to Defendants.

36.     As a result of all the fees taken by Defendants and diverted to other CFS investors, the HUD Settlement Statement reflects that the borrower, Mr. Matin, received

Page 14 of 48

me

only $31,275.09 from Plaintiffs' $50,000 investment.    The reality was that the Defendants were diverting funds away from the improvement and development of the property that served as security for Plaintiffs' investment.  Defendants' representations that Plaintiffs' funds would be used to invest in and improve the property were false and misleading, because little of Plaintiffs' money was going to the borrower.

37.    As a result of, and in reliance upon, all the above misrepresentations and omissions, Plaintiffs invested a total of $120,000 in the CFS Temple Loan.   Had Plaintiffs known the truth, they would not have invested in the CFS Temple Loan.

Plaintiffs Invest in the CA Six Flags Loan

38.    During the second week of June 2006, Lahr called Plaintiffs by telephone several times and encouraged them to invest $500,000 of their home-equity money in a loan secured by property at Six Flags Mall, in Arlington, Texas.  Lahr brokered the loan through CA.   Lahr told Plaintiffs that they should invest their money with him immediately because every day was important to earn interest; that the Six Flags Mall had strong retail income; that the principal of the borrower, Thomas E. Morris, had been one of Lahr's best borrowers for many years; and that the loan would easily satisfy a maximum loan-to-value ratio of 65%.  In reliance on Lahr's information and advice, on June 13, 2006, Plaintiffs wired $489,791.83 from Colonial Bank Alabama, N.A. to Wells Fargo Bank in San Francisco, California, for the benefit of Thomas E. Morris.  Plaintiffs later learned that Lahr's statements were false and misleading, and that Lahr had omitted to state several material facts.

39.    First, Lahr did not disclose his own pre-existing investment in the property. On March 16, 2006, Lahr (through his company Via Del Campo Partners, LP) and other

2828070.5

investors, including Aaron DeCollibus, Jamie Patterson, Pat and Mark DeCollibus, and Angela Taylor, had invested $500,000 in the Six Flags Mall.  The promissory note and deed of trust for that loan transaction reflect that the borrower was Today Palestine, LP, whose general partner is Dill 303, LP.  The general partner of Dill 303, LP was Dill, Inc.  Thomas E. Morris was president of Dill, Inc. and signed the deed of trust in favor of the investors listed above.

40.     Lahr never told Plaintiffs that he and other investors had a prior lien on the Six Flags Mall for $500,000.  Upon information and belief, consistent with the business practice of Lahr, Lahr misappropriated Plaintiffs' investment in the CA Six Flags Mall Loan, using the funds to pay himself and the other earlier investors.  In addition, on information and belief, Lahr was a silent business partner of Thomas E. Morris.  Lahr's position as an existing lender and lienholder on the Six Flags Property was material and would have been important to Plaintiffs' decision, as Lahr was urging them to invest $500,000 in the CA Six Flags Loan.

41.     Second, Lahr did not disclose material information about the borrower.  Lahr omitted to state that Thomas E. Morris was convicted of misapplication of fiduciary property, and sentenced to ten years in prison on October 3, 1986, in Cause No. 8695898, in Dallas County, Texas.  Had Plaintiffs known of Morris' criminal history, Plaintiffs would not have invested in the CA Six Flags Loan. [2]

42.     Third, Lahr made statements and omissions about the property that were false and misleading.  Most importantly, by June 2006, more than half of the Six Flags

---

[2]  The Dallas Morning News online recently reported that Morris' business partner, Eric Brauss, has fled the United States following the entry of a temporary restraining order to prevent him and his companies from transferring millions of dollars in funds held by various real estate partnerships.  The Dallas Morning News, "Closing of Today Realty Advisors Raises Questions", Friday Dec. 4, 2009. www.dallasnews.com/.../1204nbusBrauss.3

Mall was dead and unoccupied.  Lahr knew from past experience that disclosing the truth about Six Flags Mall to Plaintiffs would have caused them not to invest.  In 2005, Lahr had solicited an investment in the Mall from CFS/CA investor Denis Engel.  According to Mr. Engel, Lahr drove Mr. Engel to the Mall for an inspection.  After seeing the Mall, Mr. Engel refused to invest and told Lahr: "This is nothing but a Ponzi scheme; a house of cards waiting to fall down."  In addition, prior to June 2006, Lahr solicited an investment in the Mall from CFS/CA investor George Cullen.  After Mr. Cullen saw the property, he refused to invest and told Lahr: "What are you doing trying to sell me a dead shopping mall?"[3]

43.    Finally, Lahr misled Plaintiffs about the security for their investment in the CA Six Flags Loan.  Lahr failed to disclose that Plaintiffs were not getting a lien on the entire property owned by the borrower but, instead, the property had been divided into 18 parcels for as many separate liens.  Many of the parcels were just slivers of the Mall parking lot and other areas that did not produce income.  Plaintiffs, for example, obtained a lien on a parcel that included only part of the Mall and part of the Mall parking lot.  Lahr omitted this information and induced Plaintiffs to invest without the promised "fully collateralized" security.  Fortunately, Plaintiffs did not have to enforce their lien on the Mall.  In December 2006, before the loan was mature, Thomas E. Morris repaid Plaintiffs' investment in the CA Six Flags Loan.  However, Lahr next caused Plaintiffs to invest their money in the CFS Manor Loan.

---

[3]  The practice of flipping mortgages in dead (or decaying) shopping malls also was perpetrated by Gunn and her business partner, Jeannie Koons, on a CFS investor named Michael Freeman, with respect to Sunrise Mall in Corpus Chirsti, Texas.  Sunrise Mall, like Six Flags Mall, was owned and operated by Thomas E. Morris.

Plaintiffs Invest in the CFS Manor Loan

44.    In the first part of January 2007, Lahr invited Plaintiffs to join him and Vitaly Zaretsky on a tour of several large tracts of undeveloped land near Manor, Texas. Plaintiffs, Lahr, and Zaretsky toured three properties at the intersection of the new State Hwy 130 Toll Road and Blue Bluff Road:  a northern tract of 367 acres; a southwest tract of 414 acres, and a southern tract of 884 acres.  Lahr told Plaintiffs that Zaretsky and Manor's former mayor, Jeff Turner, purchased and owned each tract.  In fact, Lahr's statement was false and misleading.  A company called J&T Development Group, LP ("J&T") owned 100 acres within the boundaries of the northern 367-acre tract.  A company called Manor North East 167, LP[4] owned 67 acres within the boundaries of this northern 367-acre tract.  And a company called Waterfall Gallery of Austin LP[5] owned 200 acres within the boundaries of this northern 367-acre tract.  The 884-acre tract was really owned by Richard and Allen Topfer of Austin, Texas together with Vitaly Zaretsky and Gennady Borokhovich.

45.    A company called J-Tail, LLC ("J-Tail") owned the 414 acres.  The ownership of J-Tail was as follows:

---

[4]  Manor North East 167, LP was owned by Vitaly Zaretsky, Gennady Borokhovich, and Paul Faerstein. Borokhovich and Faerstein are residents of Brighton Beach, Brooklyn, New York.  Borokhovich also maintains an address at Museum Lane 10, Kylv 010125 Ukraine.

[5]   Waterfall Gallery of Austin, LP was owned by Vitaly Zaretsky and Gennady Borokhovich, and maintained a mailing address at 1709 Avenue M, Brighton Beach, Brooklyn, New York 11229.

2828070.5

**J-Tail, LLC**

> J&T Development Group, LP      (50%)
> > Vitaly Zaretsky -- GP (1%)
> > Victor Wolff
> > AR Homes (10%)
> > > Alan Topfer
> > > Richard Topfer
> > > Mort Topfer
> >
> > Blue Bluff Ventures, LLC (3%)
> > > Jeff Turner
> >
> > Cactus Capital, LP (86%)
> > > Vitaly Zaretsky
> > > Gennady Borokhovich
>
> GS Real Estate Investments, LP     (50%)
> > GS Texas Partners, LLC – GP
> > > Gene Shulman
> >
> > Gennady Borokhovich
> > Aron Grinshpun
> > Sam Zeltser
> > Zelig Zeltser[6]

Thus, several entities and, at the end of the day, at least eleven individuals, owned the property in Manor.  Plaintiffs would not have invested in the CFS Manor Loan had Lahr, Barlin, Gunn or Savrick (Plaintiffs' attorney in the transaction) disclosed the ownership structure and true identity of the borrowers.

46.     During the tour, Lahr encouraged Plaintiffs to invest in the southwest tract of 414 acres, and provided Plaintiffs with a sophisticated artist's drawing that he said represented Zaretsky's plans to develop the 414 acres for office buildings, restaurants, and commercial space.  Lahr failed to disclose, however, that the 414 acres was not zoned for such use and, in fact, Lahr had already obtained a PUD (planned unit development) from the City of Austin, which showed the zoning requirements including a golf course and a park on the property.  Lahr did not disclose the PUD to Plaintiffs and

---

[6]  Zelig Zeltser and Aron Grinshpun are also residents of Brighton Beach, Brooklyn, New York.

knew that his drawing showing the planned development for the property was false and misleading.

47.    Finally, during the tour, Lahr told Plaintiffs that the City of Austin had approved and agreed to pay for the extension of Braker Lane, a major road with significant traffic, through the 414 acres, which would bring more value and development to the property.  Lahr's statement was totally false; as Lahr well knew, the City of Austin had not approved, nor agreed to pay for, any extension of Braker Lane to or near the Manor property.

48.    Within a few days after Plaintiffs viewed the property, Lahr emailed them an appraisal of the 414 acres prepared by John Blunt, ostensibly a qualified real estate appraiser.  According to the appraisal provided by Lahr, the current "as is" fair market value of the 414 acres was $49 million.  Lahr often used "trumped up" appraisals and knew that the Blunt appraisal was false.  International Bank of Commerce ("IBC") already had a first lien on the 414 acres.  On or about October 26, 2006, IBC loaned $8,224,600.00 to J&T to purchase the 414 acres.  On November 21, 2006, J&T conveyed the property to J-Tail by an "Assumption Special Warranty Deed."  Thus, after November 21, 2006, J-Tail owned the 414 acres and IBC had a valid first lien on that property.  As part of its loan analysis, IBC obtained an appraisal of the 414 acres prepared by William R. "Dub" Smith, a state certified real estate appraiser, who estimated that the property was worth only $12.8 million.

49.    Lahr also knew and failed to disclose that J-Tail, the owner of the 414 acres, had granted several of its insiders an option to purchase the most valuable 40 acres of the tract located at the corner of the two roads that accessed and intersected

the property. Lahr did not disclose that this valuable portion of the tract had been optioned away and would not provide any security to Plaintiffs. Nor did Savrick protect his clients in the CFS Manor Loan. Savrick failed even to obtain a title policy on the 414 acres, an inexcusable error. Worse, Savrick actually knew about the option. In his files, which have been produced in related litigation, Savrick had a copy of the "Memorandum of Option Agreement" that memorialized the purchase option granted by J-Tail to its insiders, and Savrick also had a survey of the 40-acre corner tract. Still, Savrick did not inform Plaintiffs of the option. Lahr, Gunn, CFS, and Savrick, of course, never told Plaintiffs that they had no title policy on the property. Plaintiffs would not have invested in the CFS Manor Loan had these facts been disclosed.

50.     Lahr also told Plaintiffs that their investment in the CFS Manor Loan would be "doubly secured" because, in addition to taking a second lien on property worth $49 million, Plaintiffs would get a third lien on 100 acres in Manor owned by J&T. Lahr stated that the 100 acres was worth $12 million. Lahr stated that each parcel (the 414 acres and the 100 acres) would satisfy the CFS loan-to-value ratio of less than 50% for undeveloped land. This was false, because Lahr knew that the 100 acres was not worth $12 million.

51.     On November 20, 2006, less than three months before the CFS Manor Loan, Fort Worth National Bank had loaned $2 million to J&T and took the first lien on the 100 acres, which was contained within the 367-acre tract viewed by Plaintiffs on their tour with Lahr and Zaretsky. When Fort Worth National Bank made its loan, it obtained an appraisal showing that the entire 367-acre tract was worth $12 million. Consequently, less than 1/3 of the tract could not have been worth $12 million.

52.   On November 21, 2006, Lahr, CFS, Gunn, and Savrick negotiated and entered into a "Consent Agreement" with Fort Worth National Bank and J&T.   The Consent Agreement allowed J&T to grant a subordinate lien on the 100-acre tract to CFS and its investors without triggering an automatic default under the terms of the loan from Fort Worth National Bank to J&T.   The Consent Agreement was necessary for Lahr to offer Plaintiffs a third lien on the 100 acres.   Lahr, Gunn, CFS and Savrick had actual knowledge of the terms of the loan from Fort Worth National Bank to J&T, and negotiated with Fort Worth National Bank to amend or waive those terms in order to create a lien on the 100-acre tract.   Accordingly, Lahr, Gunn, and Savrick reasonably knew of the appraisal obtained by Fort Worth National Bank, and knew that the 100 acres was worth far less than $12 million.   A separate appraisal of the 100-acre tract would have confirmed that its value corresponded almost perfectly with its size in relation to the 367-acre tract.   Indeed, on April 10, 2008, Fort Worth National Bank obtained an updated appraisal of the property.   The 100-acre portion of the 367-acre tract was appraised at $3.5 million.

53.   On or about January 20, 2007, Plaintiffs called Barlin and asked him whether the CFS Manor Loan was a good investment and whether the property was as valuable as Lahr was claiming.   Barlin told Plaintiffs that it was a good investment, one of the best deals Greg has ever done," and that Zaretsky was an impressive entrepreneur.   Barlin did not disclose that, two months earlier, Barlin had received $15,311.25 in "referral" fees and "origination" fees from a loan that CFS made to J&T.   It turns out that Barlin introduced Zaretsky to CFS and was receiving kickbacks for loans

made by CFS to J&T.  Barlin did not disclose his financial interest in causing Plaintiffs to invest in the CFS Manor Loan.

54.    On January 30, 2007, Plaintiffs invested a total of $415,000 in the CFS Manor Loan.  Plaintiffs made their investment in three transactions:   (1) a wire of $138,000.00 from Citibank, N.A. in New York City to Union State Bank in Florence, Texas; (2) a wire of $52,000.00 from Citibank, N.A. in New York City to Union State Bank in Florence, Texas; and (3) a wire of $225,133.24[7] from Bank of New York in New York City to Union State Bank in Florence, Texas.

55.    On February 1, 2007, J&T executed a promissory note in the amount of $4 million in favor of CFS "solely in its capacity as payment agent for certain lenders named on Exhibit A," which listed the following CFS investors and amounts invested:

| | |
|---|---|
| Simons Family Trust | $1,100,000.00 |
| Brian Vodicka | $500,000.00 |
| Jon & Lisa Herkins | 500,000.00 |
| Gregory H. Lahr | $1,200,000.00 |
| To be assigned by Creative Financial Solutions | $700,000.00 |

56.    Of course, Plaintiffs had invested only $415,000, not $500,000, in the CFS Manor Loan.  However, this discrepancy in the promissory note was not a mistake by CFS, Lahr, and Savrick.  Instead, it was an intentional method to evade taxes, which Gunn and Lahr termed the "net fund" method.  Under the net fund method, loan records are prepared to hide interest income by characterizing all interest as a return of

---

[7]  $133.24 was returned to Plaintiffs as a "refund of principal".

principal. At maturity, the lender receives only one payment, which includes interest and a return of the actual amount loaned. However, the net sum appears to be only a return of the principal amount of the loan. Consequently, the lender reports no interest income from the transaction and pays no taxes on it.

57.     Likewise, Lahr did not invest $1.2 million in the CFS Manor Loan. Instead, he invested $996,000. In truth, it was Barlin's money; Lahr was a front for Barlin's investment in the CFS Manor Loan. On February 1, 2007, Lahr executed a "Promissory Note Secured By Deed of Trust" in favor Barlin for $1 million. That note stated an interest rate of 17%, equal to the interest rate stated in the promissory note for the CFS Manor Loan. On the same day, Lahr signed a "Security Agreement – Collateral Assignment and Pledge of Secured Note", transferring his rights to the lien on the real property (414 acres) to Barlin. Effectively, Barlin was an "off the books" investor in the CFS Manor Loan. However, Barlin must not have been satisfied with the security offered by the borrower in the CFS Manor Loan (supposedly, a second lien on the 414 acres, which Lahr claimed was worth $49 million). As part of the promissory note from Lahr to Barlin, Lahr had to give Barlin additional collateral. The note reflects that Lahr assigned to Barlin a $1,175,000 interest in "100 acres of Sky Station" and an unrecorded grant deed on property in New Braunfels, Texas. Obviously, Barlin and Lahr knew something about the CFS Manor Loan that Plaintiffs did not. Barlin and Lahr had induced Plaintiffs to invest in the CFS Manor Loan without disclosing their own transactions with respect to that loan.

58.     Although the promissory note for the CFS Manor Loan stated that $3.3 million of the total $4 million loan had been funded on February 1, 2007, the HUD

settlement statement for the CFS Manor Loan inconsistently stated that the amount of the loan was $1,826,133.24. Discovery will be necessary to determine what happened, and who received the difference of $1,473,866.76.

59.     The HUD settlement statement also reflects that CFS collected an "origination" fee of $234,000 from the loan proceeds, and Barlin received $25,000 in "origination" fees in the CFS Manor Loan.  Further, in sworn testimony, Barlin has admitted he received a $30,000 check from Zaretsky and Sons, LP, a payment that was funneled through the escrow account of North American Title Company and that was neither reflected on the settlement statement nor disclosed to Plaintiffs.  Of course, Lahr and Barlin never told Plaintiffs that Barlin was getting kickbacks based on all of Plaintiffs' investments with Lahr, or that Barlin was getting kickbacks from the borrower in the CFS Manor Loan.

60.     In addition to the promissory note, on February 1, 2007, borrower J&T executed a "Deed of Trust and Security Agreement" to Savrick, as trustee for CFS. Exhibit B to the "Deed of Trust and Security Agreement" provided the CFS investors, including Plaintiffs, with a third lien on the 100 acres owned by J&T (which Lahr falsely claimed was worth $12 million).  The "Deed of Trust and Security Agreement" was signed by Jeff Turner, former mayor of Manor, as the Manager of Blue Bluff Ventures, LLC, the general partner of J&T.  On February 15, 2007, J&T executed a "Notice of Amendment", which amended the "Deed of Trust and Security Agreement" to include the second lien on the 414-acre tract.  Again, Jeff Turner signed that document in his capacity as manager of the borrower's general partner.

61.     Lahr, Gunn, CFS, and Savrick intentionally concealed and failed to disclose to Plaintiffs the fact that J&T was not the owner of the 414 acres.  Instead, Lahr lied to Plaintiffs, telling them that they were getting a valid second lien on the 414 acres.  The reason for Defendants' fraud was simple:  J-Tail (the owner of the 414 acres) could not grant CFS a second lien on the 414 acres without violating the terms of the loan by IBC.   IBC's deed of trust on the 414 acres stated, in a separate paragraph: "GRANTORS WILL NEITHER CREATE NOR PERMIT ANY JUNIOR OR SUBSEQUENT LIENS OR ENCUMBRANCE AGAINST THE PROPERTY WITHOUT PRIOR WRITTEN CONSENT OF BENEFICIARY."  Savrick knew of this prohibition because: (a) he is an attorney and would know that such a provision is standard and required by banks, (b) he in fact received a copy of IBC's deed of trust and produced it from his files in litigation related to this action, and (c) he assisted Lahr, Gunn, and CFS with the "Consent Agreement" executed with Fort Worth National Bank and J&T less than three months prior to the CFS Manor Loan.

62.     The fraud by Lahr, Gunn, and Savrick against Plaintiffs and the other investors in the CFS Manor Loan was calculated and willful.  On or about June 6, 2008, Jeff Turner called former counsel for Plaintiffs and provided a tape-recorded statement, which has been transcribed.  In his statement, Mr. Turner said that Zaretsky, Lahr, and CFS knew that J&T did not own the 414 acres and knew that the CFS investors were not receiving any security on the 414 acres.  According to Turner, Zaretsky said: "Jeff, it's not a big deal.  Greg Lahr and Creative [Financial] Solutions know about this.  We needed to do that at that time so that we wouldn't lose the IBC loan.  So it's fine what we did.  Greg just needs to wave some type of a title in front of his investor's face."

63.    In related litigation, Lahr testified that he was aware that IBC's deed of trust precluded inferior liens but, despite that knowledge, he did not obtain permission from IBC to create a second lien on the property that was to serve as security for Plaintiffs in the CFS Manor Loan.

64.    Lahr, Gunn, and Savrick knew that the CFS investors could not get a lien on the 414 acres without causing an automatic default on the loan from IBC, so they purposefully designed the loan transaction to have J&T grant a false lien.  Obviously, Plaintiffs never would have invested in the CFS Manor Loan knowing the truth:  they could not get a lien on the 414 acres from the borrower, and the taking of any lien on that property would trigger foreclosure by IBC.

65.    In June 2007, Plaintiff Vodicka received proceeds from the settlement of a lawsuit unrelated to this action.  Barlin and Lahr were aware of this and, on June 21, 2007, invited Plaintiffs to meet with them at Barlin's home.  At the meeting, Lahr and Barlin encouraged Plaintiffs to invest their new funds in the CFS Manor Loan.  Specifically, Lahr and Barlin suggested that Plaintiffs should buy a part of Lahr's interest in the loan.   At the end of the meeting, Plaintiffs agreed to invest an additional $500,000.  Lahr and Barlin asked Plaintiffs to make the check payable to Barlin.  They stated that it would be more efficient that way, because Lahr owed money to Barlin.  Of course, they did not disclose that Barlin had financed Lahr's initial investment in the CFS Manor Loan.  As a result of the statements and omissions made by Lahr and Barlin, Aubrey wrote a check to Barlin on June 21, 2007 for $500,000, which was drawn on Capital One, N.A.

66.     On July 2, 2007, Lahr executed an "Assignment of Note and Lien Interest" in favor of Vodicka, transferring his interest of $555,000 (an inflated figure based on the $1.2 million that Lahr/Barlin had invested using the "net fund" method) in the CFS Manor Loan to Vodicka.

67.     On August 18, 2007 (less than two months after Barlin and Lahr encouraged Plaintiffs to invest additional funds in the CFS Manor Loan), Lahr flipped his remaining interest of $645,000 in the CFS Manor Loan to CLC, a company formed by Schiffgens and controlled by Lahr.  Schiffgens has admitted in sworn testimony that CLC had no assets other than a checking account, a desk, and a computer.  Lahr later told Plaintiffs, in an email dated February 24, 2008, that CLC's investment in the loan was financed by Barlin.  Hence, this was another disguised, "off the books" transaction involving Barlin.  Discovery will be necessary to determine whether any funds actually changed hands, and whether the transaction had any economic substance.

68.     On September 28, 2007, CLC executed four "Limited Collateral Transfer of Lien" documents that brought four new investors into the CFS Manor Loan.  Lahr and Schiffgens, through CLC, transferred the following investment interests in the CFS Manor Loan:  (1) $325,000 to Larry Chaney; (2) $125,000 to Martin and Gay McNair; (3) $80,000 to Jim Williams; and (4) $75,000 to Monica Snideman.  Plaintiffs did not know, and Lahr never disclosed, the fact that Lahr had gotten himself out of the CFS Manor Loan well before its maturity.  Plaintiffs would not have invested in the CFS Manor Loan had the foregoing facts been disclosed by Defendants.

Plaintiffs Invest in the CA Long Beach Loan

69.     Two months after Plaintiffs invested in the CFS Manor Loan, Lahr solicited their investment in a loan secured by a single-family residence in Long Beach, California (the "CA Long Beach Loan").   Lahr told Plaintiffs that the loan was of the highest quality and was a secure investment.  Lahr stated that the borrower, Jenelita Brooks, was a friend of his, was one of his oldest and most trustworthy borrowers, and was an experienced real estate developer.  Lahr stated that Ms. Brooks always repaid investors, and was remodeling this home for renters.  Lahr also stated that the property was so valuable that he had loaned his IRA retirement funds to Ms. Brooks and taken a first lien on the property.

70.     In reliance on Lahr's statements, Plaintiffs invested $140,000 in the CA Long Beach Loan on April 19, 2007.  Plaintiffs wired the funds from their account at Capital One, N.A. in Austin, Texas to Comerica Bank in Silicon Valley, California, for deposit in an account registered to United Title Co.

71.     Lahr knew or should have known, through the exercise of reasonable diligence, that the borrower did not have a permit from the City of Long Beach to remodel the home.  Moreover, Lahr simply lied about investing his IRA retirement funds with the borrower and taking a first lien on the property.  Lahr's statement in that regard was completely false.

72.     The borrower never remodeled the home for rental, and defaulted on the CA Long Beach Loan approximately one month before the maturity of the note to Vodicka.  The first lienholder, First American Loan Star, eventually foreclosed on the property, and Plaintiffs lost approximately $70,000 of their investment.  Plaintiffs would

not have invested in the CA Long Beach Loan but for Lahr's material misrepresentations and omissions.

Additional Fraudulent Practices

73.    It was the business practice of Defendants Lahr, Gunn, and CFS not to provide copies of the promissory notes, deeds of trust, HUD settlement statements and related loan documents to Plaintiffs or other investors.    This practice enabled Defendants to control the flow and use of investment funds, hide fees and kickbacks paid to Defendants, disguise transactions, inhibit contact between investors and borrowers, and otherwise execute all features of the fraud they perpetrated on Plaintiffs and others.

74.    One motive of the control and concealment exercised by Defendants was tax fraud.  Lahr, Gunn, Schiffgens, and Savrick never created, obtained, or issued an IRS Form 1099 to or for Plaintiffs in any of their investments with Lahr.  On information and belief, it was the business practice of Lahr, Gunn, CFS, and Schiffgens not to use or require tax records reflecting the transactions in any CFS loans.  In August 2007, Plaintiffs met with Defendants Lahr and Schiffgens at Schiffgens's office: 3636 Executive Center Drive, Suite G-60, Austin, Texas 78731.  Plaintiffs were trying to prepare their federal taxes for the year 2006, and requested 1099's reflecting their interest income from the CFS loans.  Lahr and Schiffgens stated that tax records would be "forthcoming" but, of course, that was not true and they had no intention of providing such documentation to Plaintiffs.[8]

---

[8]  Plaintiffs also requested that Lahr and Schiffgens provide them with a written agreement delineating the duties of CFS to its investors, but no such agreement was ever provided.

75.     Neither Lahr nor Gunn (who kept all business records for CFS at her home) nor Schiffgens (a certified public accountant) nor Savrick (the attorney who prepared all documents for CFS loans and inexcusably served as the attorney for Plaintiffs and CFS, Lahr, and Gunn in all the transactions) ever provided a Form 1099 to Plaintiffs at any time, for any investment.  Plaintiffs ultimately did their own accounting and reported their interest income from the CFS and CA loans on their IRS Form 1040, Schedule B.  On information and belief, Defendants avoided the use of 1099's in order to hide taxable income for themselves and their investors, and to further reduce any transparency for the loan transactions that Defendants were promoting, structuring, and profiting from.

76.     Another feature of the fraud perpetrated against Plaintiffs was a Ponzi scheme.  Undisclosed to Plaintiffs was the fact that much of their investment, which was supposed to go to the borrower for the development of the real property, was in fact going to other CFS investors to pay interest on loans they had invested in.   For example, in the CFS Temple Loan, CFS used Plaintiffs' money to pay "May 2006 Interest" to the following CFS investors:   (1) $900.00 to Dovie J. Hayden Trust; (2) $700.00 to Ed and Vicki Butler; (3) $900.00 to Leroy Green; (4) $1,250.00 to Fiserv ISS & Co. f/b/o Kenneth Hardie; (5) $1,000.00 to Bonnie Krauss; (6) $625.00 to Bernard Laves Trust; and (7) $625.00 to Kay R. McMillan.  With the exception of Dovie J. Hayden Trust, none of the other CFS investors loaned funds to Mr. Matin, the borrower in the CFS Temple Loan, or otherwise had any lien on the Nadine Apartments. According to spreadsheets produced to Plaintiffs by Defendant Savrick, investors (2) – (7) above made loans on property in San Angelo.  CFS used money from new investors

(Plaintiffs) to make interest payments to earlier investors of CFS. All of this, of course, was undisclosed to Plaintiffs.

77. Finally, Defendants used false and misleading advertising to lure the investors. In deposition testimony in a prior action, Lahr and Lisa Caufmann, a former principal of CFS, identified brochures and promotional materials that CFS distributed to prospective investors. A sample of such materials stated, inter alia:

**The Role of CFS**

CFS conducts extensive evaluations to insure our investment opportunities are sound. Our evaluation process begins with a thorough review of the Borrower and the proposed loan/investment opportunity/property that will be used to secure the loan:

The first step involves evaluation of the loan request and the Borrower. We: meet with the Borrower and evaluate the plan for the property, including the "exit strategy"; personally inspect the property and explore the surrounding area to corroborate the appraisal and substantiate the Borrower's plan for the loan; obtain and review all documents related to the property/transaction (appraisal, commitment from the Title Company, sales contract, etc.); [and] review the Borrower's financial status and corporate documents if applicable.

When this evaluation is completed, we offer the loan as an investment opportunity to our Lenders, many of whom have been clients for over 10 years. Our loans use a very conservative "Loan To Value" ratio. . . . .

78. Had Plaintiffs been aware of the true nature of Defendants' business practices, they would not have invested in the loans.

Default and Foreclosures

79. Plaintiffs received monthly interest payments from CFS on their investment in the CFS Temple Loan for approximately six months. Mr. Matin did not make timely interest payments to Plaintiffs in January and February of 2007. In June 2007, Lisa Caufmann gave Plaintiffs a check of $1,500 for partial payment of past due

interest. However, later that month, Mr. Matin finally defaulted. In December 2007, Plaintiffs foreclosed on the third lienholder, Ben Edwards. By March 2008, Plaintiffs had bought out the first lienholder and were making arrangements to sell the property. At that time, Barlin met with Plaintiffs and suggested that they transfer the Temple property to him, so that he could sell it at a loss and receive a tax deduction. When Vodicka stated that Lahr wanted to obtain an appraisal on the Temple property to support Barlin's tax deduction, Barlin changed his mind and told Plaintiffs: "I do not want one of Lahr's trumped up appraisals on my tax return."

80.     During that time, Aubrey called Lahr and requested a copy of the appraisal (supposedly for $465,000) that Lahr claimed he had, when he caused Plaintiffs to invest in the CFS Temple Loan. This time, Lahr told Aubrey that a man named Vance Powell had appraised the Temple property at $400,000, and Lahr would provide Aubrey with a copy. Despite multiple requests, Lahr never provided Plaintiffs with an appraisal of the Temple property. Even after the borrower, Mr. Matin, had defaulted and Plaintiffs had seen for themselves that the Nadine Apartments were vacant and falling apart, Lahr was still lying to Plaintiffs about the value of the property.

81.     On February 22, 2008, Aubrey called Gunn and requested that she send him a copy of any appraisal that CFS had for the Temple property. Gunn told Aubrey that Lisa Caufmann had two copies of the $400,000 appraisal, and that one copy was on top of Schiffgens's file cabinet. Gunn promised to provide Aubrey with a copy, but she never did. On February 22, 2008, Aubrey called again to ask Gunn for the appraisal. This time, Gunn stated: "I know nothing of Lahr having a $400,000

appraisal; I only know of an appraisal for $100,000." To date, Lahr and Gunn have not provided Plaintiffs with an appraisal of the Temple property.

82.     Ultimately, on May 9, 2008, Plaintiffs sold the Temple property to the City of Temple, and sustained damages of at least $56,000, representing lost principal and interest.

83.     With respect to the CFS Manor Loan, in November 2007, J&T started having trouble satisfying its debts as they came due, including its loan obligations to IBC. Lahr, Gunn, Schiffgens, and Savrick agreed that they needed to cover their tracks and paper-over the fraud that they had performed: J&T did not own the 414 acres that was pledged as security for the CFS Manor Loan. Savrick had failed to get a title policy for the property; failed to disclose material information to his clients; and had aided Lahr, Gunn, and CFS to defraud Plaintiffs in the CFS Manor Loan.

84.     On December 14, 2007, Savrick prepared and caused Jeff Turner, on behalf of J-Tail, to execute a "Third Party Deed of Trust and Security Agreement," granting Savrick, as trustee for CFS, a second lien on the 414 acres. The document prepared by Savrick stated an "effective date" of February 1, 2007. Of course, it was too late for Savrick to go back in time and remedy his failures. Savrick's "Third Party Deed of Trust and Security Agreement" was not disclosed to IBC and was done without IBC's consent. The effect of Savrick's action was to create a junior lien on the 414 acres in direct violation of the covenants in IBC's deed of trust.

85.     Neither J&T nor J-Tail ever made a single payment to IBC. From the inception of IBC's loan to J&T (October 26, 2006) until December 2007, monthly obligations on the note were satisfied from an interest reserve fund held by IBC, which

was created by the original loan proceeds, not from income generated by the property or any business activity of J-Tail or J&T.  In December 2007, that fund was insufficient to make further payments, and IBC declared the loan in default and commenced foreclosure proceedings.

86.    On February 1, 2008, J&T formally defaulted on its promissory note to CFS.  On February 4, 2008, without Plaintiffs' knowledge or consent, Savrick wrote a check to Lahr for $37,926.30 from the Savrick Firm's IOLTA account.  The memo on Savrick's check states "borrower funds."  Savrick kept the check and other documents in his file labeled "Foreclosure Work File" in a subfolder labeled:  "Creative Financial Solutions; $4 MIL CROSS LIEN 414 ACRES."  Savrick had paid Lahr the remains of any funds that would be available to Plaintiffs and other victims of the CFS Manor Loan.  There appears to be no legitimate reason for such payment.  Although Lahr (Barlin off the books) initially invested with Plaintiffs in the CFS Manor Loan, Lahr had flipped his entire interest in the loan to Plaintiffs and other investors by September 28, 2007.  Lahr was no longer an investor in the CFS Manor Loan, yet Savrick paid him the remaining "borrower funds" from Savrick's IOLTA trust account.

87.    The 414-acre tract that was supposed to be developed consistent with the drawings shown to Plaintiffs by Lahr, today remains undeveloped, raw land.  J&T and J-Tail made no improvements to the property whatsoever.  Clearly, the funds invested by Plaintiffs and others in the CFS Manor Loan were not put toward the development of the property.  The question remains, then, what happened to all the money?  Discovery of Defendants' accounting and business records will be necessary to determine how much

money actually went to the borrower, and whether Defendants diverted funds elsewhere consistent with their fraudulent practices.

88.     J-Tail and J&T were thrown into involuntary bankruptcy, and Plaintiffs lost their entire investment in the CFS Manor Loan.  At a hearing on August 29, 2008 in *In re J-Tail, LLC*, Case No. 08-10416-CAG, U.S. Bankruptcy Judge Craig Gargotta heard evidence and found that the 414 acres, which Lahr had falsely assured Plaintiffs was worth $49 million, was in fact worth only $13 million.

89.     In all, Lahr, Gunn, and Schiffgens made loans secured by more than two dozen properties in Texas.  More than 90 people, including Plaintiffs, invested in CFS loans.[9]

## V.  CAUSES OF ACTION

### First Cause of Action:  Civil RICO (18 U.S.C. §§ 1962, 1964)

90.     Plaintiffs incorporate by reference paragraphs 1 through 89 above.

91.     Defendants conducted or participated, directly or indirectly, in the promotion and sale of investments in real estate secured loans through the business

---

[9]   Those investors include, at least: Heidi Barlin, Peter Barlin, Brian Vodicka, Steven Aubrey, Ben Edwards, Ingrid Edwards, Dovie Hayden, Lincoln Trust f/b/o Jorena Bennett, Larry Chaney, Kevin Miller, Eric Bateman, Wendy Compton – Estate of Danny Compton, George Cullen, Anne Cullen, Denis Engel, Dolores Lahr, Brooks B. Nordberg, Estate of Jorena Bennett, Savell Investments, Charles E. Smith, Jr., Steven L. Dale, Anita Simons, Stanley Simons, Simons Family Trust, Thomas "Rod" Reames, Joyce Porter, Daniel Mangaroni, Lydia Mangaroni, Val Joseph Quinn, Shawn Quinn, Kenneth Hardie, Natalie Hardie, William Huddock, Chester Tutor, John Herkins, Lisa Herkins, Gregory H. Lahr, Pensco Trust Co., custodian for David Woody, Martin McNair, Gay McNair, Jim Williams, Andres Investments, Inc., Walter Stewart, Jeannie Koons, Mark Nagle,  Joseph C.  Boggins, Janice B. Jones, Ralph D. Jones, Julie T. Smith, Pam Williams, Steve Williams, Mildred Breed, Hirschi Family Trust, Rhoda Kearns-Kearns Family Trust, Marilyn Daugherty, Brauss Venture Investments, L.P., Daniel Myers, Willamae Myers, Sarah Savell, Stewart Browning, LeRoy Green, Vicki Butler, Ed Butler, Bernard Laves, Russ Emerson, Bonnie Krauss, Kay McMillian, Hiatt Living Trust, Monica Snideman, Jeana Hirschi, Michael Freeman, Mary Ellen Boggins, Gunn Minor Children Trust, Saul Sonny Essenfeld, Joan Essenfeld, Patricia Lawrence, Patricia Boss Lawrence Trust, Jerry R. Scott, Dennis Freeman, Roger DeLazaar, Mathews Yeths Trust, Aubrey Smith, Waler Bakly, James H. McCullick Trust I, Leslie Gunn, Carmen Rodriguez, Richard Skirrow, Radda Skirrow, Donald Gustafson, Jacqueline Gustafson, James Wallace, Carlene Wallace, and Jaylek Ahn.

entities CFS, CA, and CLC, which together constitutes a criminal enterprise, through a pattern of racketeering activity. Defendants repeatedly used and caused others to use interstate mail and wires to conduct the enterprise, communicate with investors and borrowers, obtain funds from investors, and disburse funds.

92.     Such racketeering activity includes wire fraud in violation of 18 U.S.C. § 1343, bank fraud in violation of 18 U.S.C. § 1344, and money laundering in violation of 18 U.S.C. § 1956.

93.     This pattern of activity is evidenced by the fraud practiced on Plaintiffs and other investors, the material misrepresentations made to Plaintiffs and other investors, and the failure to disclose material facts to Plaintiffs and other investors in connection with the CFS Beaumont Loan, the CFS Temple Loan, the CA Six Flags Loan, the CFS Manor Loan, and the CA Long Beach Loan. The pattern of activity is also evidenced by the repeated misinformation and nondisclosures to Plaintiffs after the investments and by the repeated improper use of funds invested by Plaintiffs. Plaintiffs relied on misrepresentations made in furtherance of the fraudulent scheme and those misrepresentations would have been relied upon by a reasonable person.

94.     Barlin received commissions and secret kickbacks from the enterprise for referring investors, including Plaintiffs, and borrowers, such as J&T, to the enterprise and financed the enterprise through hidden loans to Lahr. Gunn formed CFS, served as president of CFS, and received fees and compensation from CFS for each loan transaction. Lahr controlled CFS, CA, and CLC and received broker fees, commissions, and other fees from the enterprise for each loan transaction. Schiffgens formed CLC and served as its president, was Lahr's accountant, and received commissions and fees

from CLC for each loan.  Mitchell Savrick was employed by or associated with the enterprise as its attorney, prepared loan documents, and served as trustee of CFS for deeds of trust granted to CFS by borrowers.  Accordingly, to the extent that any Defendant did not him or herself commit RICO violations, the Defendants each conspired to commit these violations by agreeing to join in the pattern of racketeering activity and participating in certain predicate acts, knowing that such acts were part of a pattern of activity prohibited by 18 U.S.C. § 1962.

95.     Defendants' acts constituted violations of 18 U.S.C. § 1961 et seq., and were intended to and did proximately cause damages to Plaintiffs.  Defendants intended to cause and did cause Plaintiffs to invest in the CFS Beaumont Loan, the CFS Temple Loan, the CA Six Flags Loan, the CFS Manor Loan, and the CA Long Beach Loan, which Plaintiffs would not have done but for Defendants' wrongful actions.  Plaintiffs were the intended target of Defendants' wrongful acts, and the damage suffered by Plaintiffs was the preconceived purpose and intended consequence of Defendants' wrongful acts, including the predicate acts of wire fraud in violation of 18 U.S.C. § 1343, bank fraud in violation of 18 U.S.C. § 1344, and money laundering in violation of 18 U.S.C. § 1956.

96.     Plaintiffs have suffered actual damages greater than $1,000,000 by reason of the actions of such Defendants.  Plaintiffs are entitled to recover all such damages from all Defendants; to trebling of all such damages; to recover all income derived by Defendants or by related persons or entities; and to recover their reasonable costs of litigation herein, including attorney's fees.

**Second Cause of Action:  Securities Fraud**
**in Violation of the Securities Exchange Act of 1934 (Rule 10b-5)**

97.     Plaintiffs incorporate by reference paragraphs 1 through 96 above.

98.     Barlin and Lahr employed, using instrumentalities of interstate commerce, a device, scheme or artifice to defraud Plaintiffs in connection with the sale of securities. Barlin and Lahr made false statements to Plaintiffs and omitted to state material facts necessary in order to make statements made to Plaintiffs, in the light of the circumstances in which they were made, not misleading to Plaintiffs.

99.     Barlin and Lahr engaged in such acts with scienter, and with the intent to deceive or mislead Plaintiffs, and such actions have proximately resulted in material damages to Plaintiffs.

100.    Barlin and Lahr are therefore liable to Plaintiffs under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder.

**Third Cause of Action:  Texas Securities Act**

101.    Plaintiffs incorporate by reference paragraphs 1 through 100 above.

102.    Defendants offered and sold investment interests in real estate secured loans to Plaintiffs.   Such investment interests constituted securities that were not exempt from state regulations under the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581-1 et seq.   Such securities sold by Defendants were not licensed under the Texas Securities Act.  In addition, at all relevant times, Defendants were not registered to sell securities.   Defendants violated Section 33(A)(1) of the Texas Securities Act. Defendants are jointly and severally liable for such violations because each Defendant constituted a seller or control person or aider of a seller under Section 33.

103.   By reason of their misrepresentations and nondisclosures set forth above, Defendants offered and sold securities to Plaintiffs by means of untrue statements and omissions of material facts.   Such sales violated Section 33(A)(2) of the Texas Securities Act.  Defendants are jointly and severally liable for such violations because each Defendant constituted a seller or control person or aider of a seller under Section 33.

104.   In the course of inducing Plaintiffs to invest in the loans, Lahr, Barlin, Gunn, and Schiffgens rendered services to Plaintiffs as investment advisors.  By reason of their misrepresentations and nondisclosures set forth above, Lahr, Barlin, Gunn, and Schiffgens committed fraud and engaged in fraudulent practices in rendering such services, violating Section 33-1 of the Texas Securities Act.   Lahr, Barlin, Gunn, Schiffgens, and Savrick are jointly and severally liable for such violations because each Defendant acted as an investment advisor or investment advisor representative, or as a control person or assistant of an investment advisor or investment advisor representative.

105.   Plaintiffs suffered damages greater than $1,000,000 as a result of the foregoing illegal sales of securities and fraud by Defendants.  Plaintiffs are entitled to recover their damages and attorney's fees.

### Fourth Cause of Action:  Fraud

106.   Plaintiffs incorporate by reference paragraphs 1 through 105 above.

107.   As set forth above, Barlin and Lahr made material misrepresentations to Plaintiffs including but not limited to:  Lahr is honest, trustworthy, and dependable; Lahr is above board in all his dealings; Lahr has a proven track record of success and none

of his investors has ever lost a nickel; Barlin's sister invested with Lahr and gets her checks like clockwork; Lahr takes care of his investors, looks out for their interests, and performs all necessary research and due diligence for them; Lahr's investors are uniformly happy with him and have confidence in him; the safest and most secure way to invest your money is with Lahr; investing with Lahr is like mailbox money; Lahr's loans generate safe and secure retirement income without risking your principal; Lahr's loans are secured by real property with a loan to value ratio capped at 65% for income producing property and 50% for undeveloped land; and Lahr's loans are properly documented by qualified real estate attorneys who represent and protect the investors.

108.   Barlin and Lahr concealed and intentionally failed to disclose material facts to Plaintiffs including but not limited to:  Barlin had invested with Lahr in the Capital Advantage loan scam; Barlin received fees and kickbacks by causing Plaintiffs to invest with Lahr; Lahr's investment in the CFS Manor Loan was financed by Barlin; and Lahr had to give Barlin additional collateral for Barlin's "off the books" investment in the CFS Manor Loan.

109.   Lahr made material misrepresentations to Plaintiffs in connection with the CFS Temple Loan including but not limited to:  the property consists of newly renovated apartments; Plaintiffs' funds will be used to improve the property, except that a small part of the investment will pay off a few final remaining invoices from subcontractors; "rents are ready to roll"; the property has been appraised at $465,000; the CFS Temple Loan will be a safe investment for Plaintiffs' home equity money; and Lahr was doing Plaintiffs a favor by giving up his position in the loan.

110.   Lahr concealed and intentionally failed to disclose material facts in connection with the CFS Temple Loan including but not limited to:  the property was vacant and dilapidated; the property did not have a certificate of occupancy; the Greisbach appraisal; the borrower had already defaulted on that loan and others made by CFS; and Lahr assigned Vodicka a promissory note in the amount of $50,000 in return for Vodicka's investment of $70,000, misappropriating $20,000 without Vodicka's knowledge or consent.

111.   Lahr made material misrepresentations to Plaintiffs in connection with the CA Six Flags Mall Loan including but not limited to:  the property has strong retail income; and Plaintiffs' investment would be secured by Six Flags Mall at a loan-to-value ratio not exceeding 65%.

112.   Lahr concealed and intentionally failed to disclose material facts in connection with the CA Six Flags Loan including but not limited to:  Lahr was a silent business partner of the borrower, Thomas E. Morris; Thomas E. Morris was a convicted felon; Lahr and others had previously invested $500,000 in the Six Flags Mall and would use Plaintiffs' investment to flip Lahr and the others out of the loan; at least half of the Six Flags Mall was dead and vacant; the property had been divided into 18 parcels for separate liens, and Plaintiffs would be getting a lien on a worthless portion of the Mall parking lot.

113.   Lahr made material misrepresentations to Plaintiffs in connection with the CFS Manor Loan including but not limited to:  Vitaly Zaretsky owned the property; the drawings of extensive and large scale commercial development on the property; the City of Austin approved and agreed to pay for an extension of Braker Lane for greater

public access to the property; the Blunt appraisal of the 414-acre tract for $49 million; and the 100-acre tract was worth $12 million.

114.   Lahr concealed and intentionally failed to disclose material facts in connection with the CFS Manor Loan including but not limited to:   J-Tail owned the property, not J&T; the property was not zoned for the development that Lahr said the loan would be used for; the City of Austin's PUD showed that a large portion of the property was zoned for a golf course and park; the Smith appraisal obtained by IBC showed the property was worth only $12.8 million; J-Tail had already granted its insiders an option to purchase the most valuable corner of the tract; Lahr did not get a title policy on the property; and Lahr flipped himself out of the loan shortly after causing Plaintiffs to invest more money in it.

115.   Lahr, Gunn, Schiffgens, and Savrick engaged in acts of dishonesty, fraud and deception against Plaintiffs including but not limited to:   flipping investors (often including Lahr) in and out of mortgage loans to collect fees from investors, including Plaintiffs; failing to provide Plaintiffs with HUD settlement statements; creating two HUD settlement statements for the CFS Beaumont Loan to hide the affiliation with Allan Craig; performing the CFS Beaumont Loan through "Creative Financial Solutions" before that entity was legally formed; diverting Plaintiffs' investment in the CFS Temple Loan to pay other CFS investors who were not affiliated with the Temple property; diverting Plaintiffs' investment in the CA Six Flags Loan to pay other CA investors, including Lahr, rather than to develop the property; failing to create, use, or require IRS Form 1099's or other tax records to reflect taxable income from the loan transactions; using the "net fund" method to disguise and taxes on interest income; preparing and

executing a false deed of trust from J&T to CFS on 414 acres that were owned by J-Tail; and attempting to cover up the false lien granted by J&T, and causing J-Tail to grant a second lien on the property in violation of IBC's deed of trust.

116.  Defendants made each of the foregoing misrepresentations for the purpose of inducing Plaintiffs to invest in loans that Defendants created, promoted, sold, and/or profited from at the expense of Plaintiffs.  Such misrepresentations were known by Defendants to be false at the time they were made.  Plaintiffs relied upon each misrepresentation and invested their retirement savings in the loans.

117.  Defendants made each of the foregoing omissions and acts of concealment to hide material facts from Plaintiffs.  Defendants had a financial interest in causing Plaintiffs to invest in the loans, and each had a duty to disclose the facts to Plaintiffs.   Plaintiffs relied upon Defendants' nondisclosures of material facts, and invested their money in the loans.

118.  Plaintiffs have suffered damages greater than $1,000,000 as a direct and proximate result of the fraud committed by Defendants.  Plaintiffs are entitled to recover actual, consequential, and exemplary damages.

### Fifth Cause of Action:  Felony Theft

119.  Plaintiffs incorporate by reference paragraphs 1 through 118 above.

120.  As set forth above, one aspect of the fraud committed by Barlin and Lahr involved the diversion and misappropriation of funds invested by Plaintiffs in the loans.  Barlin and Lahr knowingly and intentionally misappropriated more than $20,000 from Plaintiffs with the intent to deprive them of such property.  Such actions by Barlin and Lahr constitute felony theft.   Under Texas Civil Practice & Remedies Code §

41.008(c)(13), Plaintiffs seek exemplary damages from Barlin and Lahr without limitation as to the amount of recovery.

### Sixth Cause of Action:  Breach of Fiduciary Duties

121.   Plaintiffs incorporate by reference paragraphs 1 through 120 above.

122.   Plaintiffs had a fiduciary relationship with Lahr, Gunn, and Schiffgens. Lahr, Gunn, and Schiffgens undertook duties to perform due diligence, supply investment advice, foreclose on defaulted loans and provide other services to Plaintiffs as their agents and brokers in the loans.  Additionally, in a prior action, Gunn and Lisa Caufmann, a former principal of CFS, admitted in sworn testimony that Lahr and Gunn owed fiduciary duties to the investors, such as Plaintiffs.

123.   Plaintiffs had an attorney-client relationship with Savrick, creating fiduciary duties as a matter of law.

124.   Plaintiffs had an informal fiduciary relationship with Barlin based on trust and confidence.  Barlin had a long association and personal friendship with Vodicka, in which he acquired influence and supplied Plaintiffs with trusted guidance and advice on investments.

125.   The fiduciary duties owed by Defendants included duties of loyalty, candor, fair dealing, and full disclosure.  Defendants breached such duties by reason of each misrepresentation, nondisclosure, and act of deception and fraud carried out against Plaintiffs, as set forth above.

126.   Such breaches of fiduciary duties proximately caused Plaintiffs to suffer damages greater than $1,000,000.   Plaintiffs are entitled to recover their actual damages and disgorgement of all fees and compensation obtained from Plaintiffs by

Defendants.   In addition, Plaintiffs are entitled to exemplary damages because such breaches of fiduciary duties were intentional.

### Seventh Cause of Action:  Civil Conspiracy

127.   Plaintiffs incorporate by reference paragraphs 1 through 126 above.

128.   Defendants conspired to defraud Plaintiffs and to conceal their fraud from Plaintiffs for as long as possible.   As described above, Defendants systematically engaged in fraudulent practices, concealment, misrepresentations, and omissions to induce Plaintiffs to invest money in the loans.  Each such act was committed to further the object and purpose of the conspiracy to defraud Plaintiffs.  The conspiracy and such acts in furtherance of it proximately caused actual and consequential damages to Plaintiffs, for which Defendants are jointly and severally liable.  Further, Plaintiffs are entitled to exemplary damages, jointly and severally against each Defendant, because the conspiracy and such acts performed in furtherance of it were undertaken with the intent to defraud Plaintiffs.

### Eighth Cause of Action:  Legal Malpractice

129.   Plaintiffs incorporate by reference paragraphs 1 through 128 above.

130.   Savrick was Plaintiffs' attorney in the loans.  As such, Savrick owed a duty to provide adequate representation and to exercise the care, skill, and diligence of a reasonably prudent attorney in real estate transactions.  As set forth more fully above, Savrick breached his duties to Plaintiffs by committing numerous errors and omissions, including but not limited to:  ignoring conflicts of interest by representing Plaintiffs and Lahr, Gunn, and CFS in the loans; defrauding Plaintiffs in the CFS Manor Loan and attempting to cover it up; failing to perform due diligence on behalf of Plaintiffs for each

Page 46 of 48

loan; failing to disclose Defendants' misrepresentations and omissions; failing to disclose Defendants' deceitful and fraudulent business practices; failing to obtain title policies on property securing Plaintiffs' investments; failing to obtain independent appraisals on property securing Plaintiffs' investments; and aiding and facilitating the mortgage fraud scam perpetrated against Plaintiffs.

131.    Such breaches by Savrick proximately caused Plaintiffs' damages. Plaintiffs are entitled to actual and consequential damages in an amount greater than $1,000,000. Plaintiffs are entitled to exemplary damages because the acts and omissions of Savrick constituted gross negligence.

## VI. PRAYER

WHEREFORE, Plaintiffs Steven B. Aubrey and Brian E. Vodicka request that Defendants be cited to appear and answer herein and that, on final hearing, the Court enter its judgment against Defendants and award Plaintiffs their damages as set forth above, including:

a.    Actual, special, consequential, and/or benefit-of-the-bargain damages exceeding $1,000,000;

b.    Attorney's fees;

c.    Pre-judgment interest;

d.    Treble and exemplary damages;

e.    Court costs;

f.    Post-judgment interest on the foregoing amounts; and

g.    Such other and further relief to which Plaintiffs may be entitled.

Dated:  January 29, 2010

Respectfully submitted,

COX SMITH MATTHEWS INCORPORATED
Diann M. Bartek
Texas State Bar No. 01838700
dbartek@coxsmith.com
Jeffrey C. Bizon
Texas State Bar No. 24068585
jbizon@coxsmith.com
Mark J. Barrera
Texas State Bar No. 24050258
mbarrera@coxsmith.com
112 E. Pecan Street, Suite 1800
San Antonio, Texas  78205
Telephone:  (210) 554-5500
Telecopier:  (210) 226-8395


By: _____
     Diane M. Bartek

**Attorneys for Plaintiffs,**
**Steven B. Aubrey and Brian E. Vodicka**

2828070.5