UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STEVEN B. AUBREY, et al., | § | No. 1:10–CV–076–DAE |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| PETER E. BARLIN, et al., | § | |
| | § | |
| Defendants. | § | |

ORDER (1) GRANTING IN PART DEFENDANT'S MOTION TO EXCLUDE
UNTIMELY DISCLOSED EXPERT TESTIMONY; (2) GRANTING IN PART
DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF EDMOND
MARTIN; (3) GRANTING DEFENDANT'S MOTION TO EXCLUDE
TESTIMONY OF JOHN R. FAHY; AND (4) GRANTING
PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF JOYCE WEEDMAN

On October 13, 2015, the Court heard Defendant Peter E. Barlin's

("Barlin") and Plaintiffs Steven B. Aubrey ("Aubrey") and Brian E. Vodicka's

("Vodicka") (collectively, "Plaintiffs") Motions to Exclude Expert Testimony and

conducted evidentiary hearings pursuant to Daubert v. Merrell Dow Pharm., Inc.,

509 U.S. 579 (1993) (the "Daubert hearings").

After reviewing the motions and the supporting and opposing

memoranda, and considering the testimony proffered at the Daubert hearing, the

Court (1) **GRANTS IN PART** Barlin's Motion to Exclude Untimely Disclosed

Expert Testimony (Dkt. # 591), (2) **GRANTS IN PART** Barlin's Motion to

Exclude Testimony of Edmond Martin (Dkt. # 589), (3) **GRANTS** Barlin's Motion

1

to Exclude Testimony of John R. Fahy (Dkt. # 599), and (4) **GRANTS** Plaintiffs'

Motion to Exclude Testimony of Joyce Weedman (Dkt. # 607).

BACKGROUND

I.    Factual Background

Plaintiffs' Second Amended Consolidated Complaint ("Complaint,"

Dkt. # 467) alleges that Defendants Barlin, Gregory H. Lahr ("Lahr"), and

Sandra F. Gunn ("Gunn") (collectively, "Defendants") fraudulently induced

Plaintiffs to loan money to what Defendants touted as a "commercial land

development project" called Sky Station in Travis County, Texas.  (Id. ¶ 13.)  Sky

Station was represented to include four developments collectively known as

Wildhorse Ranch, which was to feature 9,200 lots with commercial stores, hotels,

and restaurants.  (Id.)  Plaintiffs allege that no development ever occurred, and

Defendants pocketed the money.  (Id.)

Plaintiffs allege that Defendants committed the fraud using an illegal

land-flipping scheme and an illegal loan-flipping scheme.  Defendants utilized

numerous entities, all owned and operated by Defendants, to sell the same land to

themselves via different entities, thereby artificially inflating property values in

order to fraudulently obtain loans.  (Id. at 14.)  Plaintiffs further allege that

Defendants used North American Title Company ("NAT"), by and through its

2

agent, Karen Williams ("Williams"), to create false real estate and closing documents that enabled Defendants to continue to divert funds.  (Id.)

Plaintiffs state that in reliance upon Defendants' false representations and failure to disclose material facts, Plaintiffs loaned an excess of $1.5 million purportedly to be used to develop the land.  (Id. at ¶ 15.)  Plaintiffs also contend that Defendants never developed the property, never generated any earnings, and paid disbursements to lenders solely from other loan proceeds in a "Ponzi" scheme. (Id.)

Plaintiffs' claims stem from three loans: the "Manor Loan," the "Temple Loan," and the "Long Beach Loan."  Plaintiffs state that the Manor Loan was part of Defendants' illegal land- and loan-flipping schemes, while the Temple and Long Beach Loans were not.  However, Plaintiffs state that the latter two loans involved some of the same participants and similar means and methods of fraud. (Id. ¶ 22.)   The Manor Loan was a commercial syndicated bridge loan administrated by CFS, a mortgage brokerage allegedly owned, operated, and controlled by Lahr and Gunn.  (Id. ¶ 20.)  Plaintiffs participated in the Manor Loan by loaning $915,000.00 to J&T Development Group, L.P. ("J&T"), an entity Plaintiffs claim was created in furtherance of Defendants' fraudulent scheme.  (Id. ¶¶ 17, 20–21.)  Plaintiffs allege that J&T was a shell entity that received no benefit from the loan and did not own the majority of the properties which the loans

supposedly benefitted.  (Id. ¶ 20.)  Plaintiffs further allege that NAT diverted the loan proceeds to Defendants.  (Id. ¶ 21.)

Regarding the Temple Loan, Plaintiffs allege that they invested a total of $120,000.00 in a loan created, packaged, and offered by Creative Financial at the direction of Lahr and Gunn and promoted and sold by Lahr and Barlin.  (Id. ¶ 23.)  The investment was purportedly secured by a second lien against real property and improvements in Temple, Texas.  (Id.)  Plaintiffs state that they suffered at least $75,896.00 in damages as a result of the Temple Loan investment. (Id.)

Similarly, regarding the Long Beach Loan, Plaintiffs allege that they invested $140,000.00 in a loan created, packaged, and offered by Capital Advantage at Lahr's direction and promoted and sold by Lahr.  (Id. ¶ 24.) Plaintiffs state that this investment was secured by a junior lien against real property and improvements in Long Beach, California, and that they suffered damages in excess of $70,000.00 as a result of this investment.  (Id.)

II.   Procedural Background

After many years of tortured progress, including the consolidation of several related actions and the addition of multiple new claims and parties, on May 7, 2014, Judge Sam Sparks entered an Order Granting Defendants' Partial Motions to Dismiss.  (Dkt. # 536.)  Plaintiffs' remaining claims are as follows:

4

1) Violations of the Texas Securities Act, Tex. Rev. Civ. Stat. Art. 581-1, et seq.;

2) Violations of the Texas Securities Act, Tex. Rev. Civ. Stat. Art. 581-1, et seq. – aiding and abetting;

3) Breach of fiduciary duty against Lahr and Gunn;

4) Aiding and abetting breach of fiduciary duty against Barlin;

5) Common law fraud; and

6) Negligent misrepresentation.

On August 3, 2015, Barlin filed a Motion to Exclude the Testimony of Edmond Martin. (Dkt. # 589.) On August 10, 2015, Plaintiffs filed a Response (Dkt. # 594); on August 31, 2014 Barlin filed a Reply (Dkt. # 596); and on August 31, 2015, Plaintiffs filed a Sur-Reply (Dkt. # 603). On August 4, 2015, Barlin filed a Motion to Exclude Untimely Disclosed Expert Testimony. (Dkt. # 591). On August 11, 2015, Plaintiffs filed a Response (Dkt. # 595), and on August 18, 2015, Barlin filed a Reply (Dkt. # 597). On August 26, 2015, Barlin filed a Motion to Exclude the Testimony of John R. Fahy. (Dkt. # 599.) On September 2, 2015, Plaintiffs filed a Response (Dkt. # 606), and on September 9, 2015, Barlin filed a Reply (Dkt. # 609). On September 8, 2015, Plaintiffs filed a Motion to Exclude the Testimony of Joyce Weedman. (Dkt. # 607.) On September 21, 2015, Barlin filed a Response (Dkt. # 612), and on September 25, 2015, Plaintiffs filed a Reply (Dkt. # 615). The Court has carefully considered

each of the parties' submissions along with the arguments presented at the hearing, and analyzes each Motion below.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    b. the testimony is based on sufficient facts or data;
    c. the testimony is the product of reliable principles and methods;
    d. the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  This rule lays responsibility on the court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).

"Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"  United States v. Cooks, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Fed. R. Evid. 702).  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."  Id.

To determine whether testimony is reliable, the court must assess whether the reasoning or methodology underlying the testimony is scientifically valid.  Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc). Courts consider five non-exclusive factors in making this determination: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique is generally accepted in the relevant scientific community. Daubert, 509 U.S. at 593–94.  In evaluating these factors, the court must focus on the expert's "principles and methodology, not on the conclusions" generated.  Id. at 594.

The party seeking admission of expert testimony must show the testimony is reliable by a preponderance of the evidence.  Moore, 151 F.3d at 276. "This requires some objective, independent validation of the expert's methodology."  Id. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002) (quoting Daubert, 509 U.S. at 596).

7

"In addition to being reliable, expert testimony must 'help the trier of fact to understand the evidence or to determine a fact in issue.'"  Roman v. Western Mfg., Inc., 691 F.3d 686, 694 (5th Cir. 2012) (citing Fed. R. Evid. 702(a)).  Under Rule 702, this means that the proffered expert testimony must be relevant.  Id.  "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful."  Id. (quoting Daubert, 509 U.S. at 591 (internal quotation marks and citations omitted)).

DISCUSSION

I.    Barlin's Motion to Exclude Untimely Disclosed Expert Testimony

Barlin first moves to exclude any expert testimony not timely disclosed under the scheduling order entered on July 8, 2011.  (Dkt. # 591.)  The July 8, 2011 scheduling order required Plaintiffs to designate their expert witnesses and provide expert reports by April 17, 2012.  (Dkt. # 167.)  On that date, Plaintiffs designated John R. Fahy ("Fahy") and J. Kenneth Huff, Jr. ("Huff") as testifying experts, among others.  (Dkt. # 591, Ex. B.)  At some point thereafter, Barlin states that Plaintiffs served amended disclosures in which they designated additional attorneys' fees experts[1] as well as an expanded report from Huff.  (Id, Ex. E.)  On

---

[1] Barlin attached a copy of Huff's expanded report to his Motion (Dkt. # 591, Ex. E), but does not provide the Court with a copy of Plaintiffs' amended disclosures designating additional attorneys' fees experts.  Instead, Barlin lists the following additional attorneys' fees experts in the body of his Motion: Cox Smith, Mark Perlmutter, Henry Novak, Clifford Gorman, Donald Grissom, Adam Pugh,

8

September 11, 2014, Plaintiffs submitted their First Supplement to their First

Amended Rule 26(a)(2)(B) Disclosures, in which they designated Robert Philo and

Paul Hornsby as additional experts.  (Id., Ex. F.)  Additionally, Plaintiffs also

produced two additional reports from Huff.  (Id., Exs. I, J.)  Finally, on January 20,

2015, Plaintiffs produced another report from Fahy.  (Id., Ex. K.)

A.     History of Discovery Orders

Barlin argues that by the time the expert designation deadline passed

on April 17, 2012, the parties had already been engaged in litigation in state and

federal court for nearly four years.  (Dkt. # 591 at 4.)  Barlin further states that all

of the operative facts and transactions at issue occurred before the end of 2007, and

that Plaintiffs had more than an adequate opportunity to investigate their claims

and designate their expert witnesses before the 2012 deadline.  (Id.)  Specifically,

therefore, Barlin moves to exclude all testimony of Robert Philo, Paul Hornsby,

and the additional attorneys' fees experts.  (Id.)  Barlin also moves to exclude the

additional reports from Huff and Fahy which were disclosed after the April 17,

2012 deadline.  (Id. at 5.)

Plaintiffs respond that the July 8, 2011 scheduling order is no longer

in effect and a new scheduling order was never issued.  (Dkt. # 597 at 1.)  They

---

and Susman Godfrey.  (Id. at 4.)  However, Plaintiffs state that their lead counsel,
Brian Weil Zimmerman ("Zimmerman"), has been designated as their attorneys'
fee expert.  (Dkt. # 595 at 10.)

further claim that neither party was under any illusion that the July 8, 2011
scheduling order remained in effect after November 2012, during which time
Judge Sparks consolidated several cases into this action.  (Id. at 2.)

On November 16, 2012, Judge Sparks held a status conference at
which the parties represented that they were ready to proceed to trial and discussed
scheduling deadlines going forward.  (Dkt. # 597, Ex. A.)  In response to a
question regarding additional discovery, Judge Sparks stated, "I don't expect you
to go back over the roads that you've already driven on; but, on the other hand,
I've never seen the logic of freezing a case for two years and not allowing the
lawyers to work.  So if there is a need for supplemental deposition and there is a
good reason for it, don't come whining to me.  Produce the witness.  If there's not
a reason for it—this case has a black mark already on it, meaning it's not one of
my favorite cases."  (Id. at 12:24–13:6.)

On November 21, 2013, after being inundated with additional motions
and miscellaneous filings, Magistrate Judge Austin held a status conference to
discuss the various motions pending before the court.  (Dkt. # 597, Ex. D.)  Judge
Austin noted that at the previous hearing before Judge Sparks, the majority of
parties indicated that they were ready to proceed to trial, and that the final party
(Plaintiff Charles Tutor, who has since been dismissed from this action), indicated
that he would likewise be ready if discovery was consolidated and he could be

permitted to obtain a few additional documents and requests for production.  (Id. at 6:23–7:11.)

In sum, Judge Austin concluded, "it appeared that there was minimal additional discovery that was ever contemplated between November the 16th of 2012 and whatever trial date was anticipated then."  (Id. at 22:3–6.)  Because Judge Sparks appeared to contemplate only that one additional deposition would be taken after the November 16, 2012 hearing, Judge Austin opined that any additional discovery should be done by motion.  (Id. at 22:12–13.)  Regarding designation of experts specifically, Judge Austin stated: "So if there are any experts that need designating . . . . I think you need to file motions on that."  (Id. at 28:1–4.) Following the hearing, on December 6, 2013, Judge Austin issued a written order denying Plaintiffs' motions to compel additional discovery, stating that the "substantial" additional discovery sought by Plaintiffs was "inconsistent with the representations made to [Judge Sparks] in November 2012."  Judge Austin further noted that "Plaintiffs have made no attempt to seek leave to pursue the discovery, nor have they shown good cause for being permitted to conduct the discovery at this late date."  (Dkt. # 465.)

The Court finds that Judge Austin's comments at the November 21, 2013 hearing constitute an oral order that the parties should file a motion before attempting to designate additional experts.  Plaintiffs' designation of additional

11

experts and additional reports from their existing experts after November 21, 2013

constitutes a clear violation of Judge Austin's order.  Therefore, the Court must

evaluate whether exclusion of those experts and additional testimony is warranted.

When a party violates a discovery order, district courts consider four

factors in determining whether excluding expert designations is warranted: "(1) the

explanation, if any, for the party's failure to comply with the discovery order;

(2) the prejudice to the opposing party of allowing the witnesses to testify; (3) the

possibility of curing such prejudice by granting a continuance; and (4) the

importance of the witnesses' testimony." Barrett v. Atl. Richfield Co., 95 F.3d

375, 380 (5th Cir. 1996); Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.

Inc., 73 F.3d 546, 569 (5th Cir. 1996).  The burden is on the party that violated the

order to show that the failure to comply with the discovery rule was harmless.

See id.

    B.    Plaintiffs' Explanation for Failing to Comply with Discovery Order

Plaintiffs' only explanation for their failure to comply with the

discovery order is that discovery was ongoing with the permission of Judge Sparks,

and that they designated their additional experts as soon as they knew they would

be needed based on the new information obtained in later discovery.  (Dkt. # 595 at

12.)  As explained above, Judge Sparks clearly did not contemplate or permit

extensive discovery beyond the November 2012 hearing, when Plaintiffs

represented that they were ready to proceed to trial, and Plaintiffs offer no explanation as to why the discovery leading to their additional expert designations was not completed in a timely fashion.

The Fifth Circuit has stated that it takes a party's lack of explanation for failing to comply with a discovery order seriously, and has held that exclusion of expert witnesses is "particularly appropriate" where the party has "failed to provide an adequate explanation for their failure to identify their expert within the designated timetable." Betzel v. State Farm Lloyds, 480 F.3d 704, 707 (5th Cir. 2007) (quoting 1488, Inc. v. Philsec Inv. Corp., 939 F.2d 1281, 1289 (5th Cir. 1991)). Thus, this factor weighs in favor of exclusion.

C.    Prejudice to Defendants of Allowing Witnesses to Testify

Plaintiffs assert that allowing their additional attorneys' fee witness to testify will not prejudice Barlin because Barlin was aware that an attorney would provide fee testimony, and Plaintiffs designated Zimmerman as their fee expert over a year ago. (Dkt. # 595 at 10.) Regarding the supplemental reports from Huff and Fahy, Plaintiffs argue that the supplemental reports merely expand on their existing opinions based on the additional information gained through additional discovery. (Id.) Finally, Plaintiffs state that Hornsby and Philo were retained to provide additional expert opinions based on new information generated in the additional discovery. Plaintiffs further argue that Barlin has been aware of these

13

designations for approximately one year, and Barlin has not taken any action to depose these experts.  (Id. at 10–11.)  In sum, Plaintiffs' position is that because Barlin has been on notice of these experts and their opinions for a significant amount of time, no prejudice will result from admitting the proposed testimony.

Barlin responds that allowing Plaintiffs' untimely expert testimony will significantly add to Defendants' financial burden because they would incur additional expenses in analyzing the new reports, re-depose Huff and Fahy, and depose Philo and Hornsby.  (Dkt. # 597 at 4.)  Barlin also states that he may be forced to designate additional experts of his own in response to the late-disclosed testimony from Plaintiffs' experts.  (Id.)  The Fifth Circuit and other district courts have often considered additional expense as a factor weighing in favor of finding prejudice in this context.  See, e.g., Betzel, 480 F.3d at 708; Geiserman, 893 F.2d at 791; Barrett, 95 F.3d at 381; Qualls v. State Farm Lloyds, 226 F.R.D. 551, 554 (N.D. Tex. Mar. 30, 2005).

This case is admittedly different from the typical case in which a party discloses new experts shortly before trial, leaving their opponent scrambling to take new depositions and possibly change their trial strategy.  However, as the above overview of this case's history shows, Plaintiffs should have known that such extensive additional discovery was not permitted in the first instance.  While Barlin perhaps should have filed the instant motion sooner, this does not change

14

the fact that Judge Sparks and Judge Austin both made it clear to the parties that

discovery should have been very near completed three years ago.  Plaintiffs were

required to file a motion before designating additional experts, and they failed to

do so.  The Court finds that requiring Defendants to incur additional expenses in

responding to new experts and testimony that Plaintiffs disclosed in violation of

Judge Austin's order would result in prejudice to the defendants because they

reasonably believed that they would not be required to participate in further

discovery at that point.[2]  Thus, this factor also weighs in favor of exclusion.

However, the above discussion does not apply equally to Plaintiffs'

designation of Zimmerman as an attorneys' fee expert.  "[P]roving attorney fees

via the expert testimony of counsel is expected."  Mungia v. Judson Indep. Sch.

Dist., No. SA-09-CV-395-XR, 2010 WL 707377, at *1 (W.D. Tex. Feb. 24, 2010).

Because attorneys' fees are determined at the close of a case, late designation does

not result in prejudice to the opposing party.  Id.; Straus v. DVC Worldwide, Inc.,

484 F. Supp. 2d 620, 633 (S.D. Tex. 2007).  Although Plaintiffs offer no

explanation as to why they chose to disclose Zimmerman after the deadline and

---

[2] It is important to note that Barlin and the other Defendants did not produce the discovery material that resulted in Plaintiffs' additional designations.  Plaintiffs state in their Response that the additional reports from Huff and Fahy and the designations of Hornsby and Philo were the result of documents obtained from third party discovery.  (Dkt. # 595 at 7.)

without filing a motion as ordered by Judge Austin, the Court finds that

Zimmerman's late designation does not prejudice Barlin.

      D.    <u>Possibility of Curing by Granting a Continuance</u>

      Plaintiffs state that no continuance is necessary as trial is not

scheduled for another five months, and Barlin has had more than ample time to

depose the late-disclosed experts.  (Dkt. # 595 at 12.)  The Court agrees that if it

were inclined to deny Barlin's motion, no continuance would be necessary.

      E.    <u>Importance of Witnesses' Testimony</u>

      Plaintiffs state that Zimmerman's testimony on attorneys' fees is

necessary because their prior attorney has little to no interest in testifying and

cannot testify about fees incurred after his withdrawal from the case.  (Dkt. # 595

at 7.)  Where, as here, a plaintiff has asserted a claim for attorneys' fees in the

complaint, expert testimony is obviously crucial to establishing that claim.  <u>See</u>

<u>Mungia</u>, 2010 WL 707377, at *1.  The Court finds that this factor weighs against

excluding Zimmerman's testimony.

      Regarding the other late-disclosed witnesses, Plaintiffs contend that

their testimony is necessary to help explain to the jury the details of the Ponzi

scheme(s) allegedly carried out by Barlin and the other defendants.  (Dkt. # 595 at

7.)  Specifically, Plaintiffs state that Philo will explain the title fraud allegedly

perpetuated by Defendants and describe the illegal disbursements made to

Defendants, and that Hornsby will explain that the real estate at the center of the

scheme to defraud Plaintiffs was not valued as Defendants claimed.  (Id. at 7–8.)

Plaintiffs make no argument regarding the expanded reports from Huff and Fahy.

        The Fifth Circuit has held that "[t]he importance of such proposed

testimony cannot singularly override the enforcement of local rules and scheduling

orders."  Barrett, 95 F.3d at 381 (quoting Geiserman, 893 F.2d at 792)).  As

explained above, Plaintiffs' lack of explanation for the untimely designation and

the prejudice to Barlin and the other defendants weighs in favor of excluding the

untimely-disclosed experts.  The Court finds that although Philo and Hornsby's

testimony may bolster Plaintiffs' case at trial, Plaintiffs have engaged other

securities and fraud experts who will testify, and Plaintiffs should not be permitted

to take advantage of the extensive additional third party discovery which they did

not have permission from the Court to conduct.

        For the reasons stated above, the Court **GRANTS IN PART** Barlin's

Motion to Exclude Untimely Disclosed Expert Testimony (Dkt. # 591).  The Court

will not exclude Zimmerman's testimony on attorneys' fees, but grants Barlin's

Motion in all other respects.

II.    Barlin's Motion to Exclude Testimony of Edmond Martin

        Barlin next moves to exclude the testimony of Edmond Martin

("Martin").  (Dkt. # 589.)   Martin's proposed testimony concerns the Temple Loan

and the Manor Loan.  Martin opines that the loans were part of a Ponzi scheme and states that he observed other "indicia of fraud" in the transactions at issue. ("Martin Report," Dkt. # 589 at 10–21.)  Barlin moves to exclude Martin's testimony on the grounds that (1) Martin is not qualified to give the opinions expressed in his report, (2) his testimony will not aid the jury, and (3) his opinions are not reliable.  (Dkt. # 589 at 1.)  The Court discusses each argument in turn.

A.    Qualifications

A witness may be qualified as an expert if he possesses specialized knowledge, skill, experience, training, or education.  Fed. R. Evid. 702.  The inquiry is whether the witness's qualifications allow him to form a reliable opinion on a relevant issue.  See Huss v. Gayden, 571 F.3d 442, 455 (5th Cir. 2009). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999).  However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."  Huss, 571 F.3d at 452.

Martin is a certified fraud examiner and a Texas certified investigator with over forty years of training and experience in forensic accounting, investigations into money laundering and fraudulent financial activities, and the

18

application of commonly accepted fraud examiner principles to the analysis of financial records and related documents.  (Martin Report at 1; Dkt. # 589, Ex. A.) He was a Special Agent with the Internal Revenue Service in the Intelligence and Criminal Investigations Divisions for 25 years.  He also acted as a supervising examiner for the State of Texas Securities Board and worked as an accountant and private investigator.  (Martin Report at 1; Dkt. # 589, Ex. A.)  Currently, Martin is the owner and principal of Sage Investigations, LLC which performs private investigative and forensic accounting services.  (Martin Report at 1; Dkt. # 589, Ex. A.)

Barlin first argues that Martin's background and experience do not qualify him to opine that the loans in question were part of a Ponzi scheme as distinguished from imprudent investments where the bargained-for risk materialized.  (Dkt. # 589 at 3.)  The Court finds Barlin's argument without merit. The entirety of Martin's work experience deals with financial fraud.  In an unpublished opinion, the Fifth Circuit expressly found that an expert with accounting experience is qualified to testify as to the existence of a Ponzi scheme.[3] In re Rodriguez, 95 F.3d 54, 1996 WL 460144, at *1–2 (5th Cir. Aug. 2, 1996).  In fact, Martin has served as a court-appointed expert in this district in a criminal matter involving securities fraud, fraudulent loans, and an alleged Ponzi-like

---

[3] While the Court does not rely on unpublished opinions as the law of this Circuit, the Court does in this case find the reasoning in this opinion persuasive.

scheme.  See Barton v. United States, Nos. A-13-CA-910-SS, A-11-CR-083-SS, 2014 WL 131194, at *1 n.4 (W.D. Tex. Jan. 10, 2014).  The Court finds that Martin is qualified to offer his opinion that the loans in question were part of a Ponzi scheme.

   Barlin also argues that Martin lacks qualifications to opine that Defendants' alleged acts and omissions were material and would have affected the decisions of reasonable investors.  (Dkt. # 589 at 3.)  Martin does not have substantial experience in advising investors or recommending particular investments to the average person.  For this reason, the Court finds that he is not qualified to offer an opinion as to what facts would influence a reasonable investor's decision whether or not to make a certain investment.  See MTV Capital Ltd. P'ship v. Quvis, Inc., No. CIV-07-0981-HE, 2008 WL 5516517, at *2 (W.D. Okla. Nov. 12, 2008) (finding that a securities regulation lawyer without experience advising investors lacked qualifications to testify as to what a reasonable prospective investor would consider important in its decisionmaking); Koch v. Koch Indus., Inc., 2 F. Supp. 2d 1385, 1398 (D. Kan. 1998) (finding that an accountant was not qualified to testify as to what might be material to a prudent investor).

B.   <u>Relevance</u>

An expert's opinion is relevant if it would "be helpful to the jury in understanding the evidence or determining a fact in issue."  <u>Daubert</u>, 509 U.S. at 591.  Thus, an expert may "suggest an appropriate inference to be drawn from the facts in evidence if the expert's specialized knowledge is helpful in understanding the facts."  <u>United States v. Willey</u>, 57 F.3d 1374, 1389 (5th Cir. 1995).  Barlin argues that Martin's opinions regarding the existence of a Ponzi scheme are irrelevant because the jury will never be asked to decide whether a Ponzi scheme existed.  (Dkt. # 589 at 5.)

Count 9 of the Second Amended Complaint alleges a cause of action for violations of the Texas Securities Act ("TSA") against all three Defendants. (Dkt. # 467 ¶¶ 155–58.)  Under the TSA, "[a] person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him."  Tex. Rev. Civ. Stat. art. 581-33, subd. A(2). Evidence that Defendants were operating an illegal Ponzi scheme could support a finding of liability under the TSA.  <u>See, e.g.,</u> <u>Sterling Tr. Co. v. Adderley</u>, 168 S.W.3d 835, 845 (Tex. 2005).

However, Barlin argues that Martin's opinions regarding the alleged Ponzi scheme are irrelevant and unhelpful to the jury because Martin relied on an incomplete definition of a Ponzi scheme.  Specifically, the characterization of a Ponzi scheme in Martin's report fails to include an essential aspect of an illegal Ponzi scheme—namely, that money contributed by later investors is used to pay dividends or returns for the earlier investors.  See Janvey v. Alguire, 647 F.3d 585, 597 (5th Cir. 2011) ("A Ponzi scheme is a 'fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments.'") (quoting Black's Law Dictionary 1198 (8th ed. 2004)).

Instead, Martin states that the following elements are traditionally found in and associated with Ponzi schemes:

1) Successful credible promoter with a promise that the investment will achieve an above normal rate of return, with an explanation of how the investment can achieve the above normal rate.

2) An investment account, limited partnership agreement, investment contract, or some type of security instrument is used as a means or artifice to satisfy the victims [sic] need to know their money is safe.

3) The investor's funds are not put to use in a meaningful business that generates returns that can support the promised returns on the investment.

4) For the first few interest payments, the investor needs to receive at least the promised rate of return, if not better, to build confidence in the promoter and the investment.

    5) Other investors hear about the investments and are encouraged to invest so that more money continues to come in to [sic] the scheme.

(Martin Report at 4.)

       The Court agrees with Barlin that the above characteristics could describe a legitimate investment, albeit a very poor one.  Plaintiffs respond that although Martin does not mention the essential aspect of a Ponzi scheme described above, his conclusions clearly indicate that he took that aspect into account in forming his opinions.  (Dkt. # 594 at 5.)  The Court agrees.  Martin's detailed analysis of the transactions at issue includes findings that funds received from later investors, including Plaintiffs, were pooled and disbursed to earlier investors. (Martin Report at 5, 7–9, 12.)  Furthermore, Martin's testimony at the <u>Daubert</u> hearing leaves no doubt that he took this aspect into account in reaching his conclusions regarding the existence of a Ponzi scheme.  At the hearing, Martin testified that the section of his report detailing the definition of a Ponzi scheme inadvertently omitted this aspect of the definition.  He further clarified that he defines a Ponzi scheme as one in which new investors are fraudulently induced into making investments, the funds from which are then paid out to older investors contrary to the representations made to the new investors at the time they chose to invest.  The Court finds that this testimony is relevant and helpful to the jury in determining whether Defendants are liable under the TSA.

Furthermore, scienter is an element of Plaintiffs' state law claim for common law fraud.  See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 314 S.W.3d 323, 337 (Tex. 2011) (noting that scienter as to the falsity of a representation at the time it was made is an element of fraud under Texas law). Operation of a Ponzi scheme may serve as evidence of fraudulent intent.  See, e.g., Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006); Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008); Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995); Quilling ex rel. Sardaukar Holdings, IBC v. Schonsky, No. 3:05-CV-2122-BH(H), 2006 WL 3772302, at *3 (N.D. Tex. Dec. 19, 2006).  Thus, evidence of a Ponzi scheme is also relevant and helpful to the jury as to Plaintiffs' common law fraud claim.

Barlin also argues that Martin's testimony regarding what information would be important to the average investor must be excluded on relevance grounds because the jurors will be able to make such determinations themselves.  (Dkt. # 589 at 5; Dkt. # 596 at 6.)  Because the Court has already determined that Martin is not qualified to offer such testimony, the Court need not reach this argument.

C.    Reliability

As explained above, to determine whether testimony is reliable, a court must assess whether the reasoning or methodology underlying the testimony is scientifically valid.  Moore, 151 F.3d at 276.  Courts consider the five

non-exclusive <u>Daubert</u> factors listed above in making this determination.  <u>Daubert</u>,

509 U.S. at 593–94.  However, because the <u>Daubert</u> factors are not always easily

applied to non-scientific testimony, courts have "considerable leeway in

deciding . . . whether particular [non-scientific] expert testimony is reliable."

<u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 150–52 (1999).

   Barlin argues that Martin's testimony is unreliable because Martin

bases his opinions on his own definition of a Ponzi scheme, which Barlin asserts

differs from the definition accepted by the Fifth Circuit.  (Dkt. # 589 at 4.)  For the

reasons explained above, the Court finds that Martin's expert report does account

for the fact that a classic Ponzi scheme involves using payments from new

investors to make payments to older investors.  The Court therefore declines to

find Martin's testimony unreliable on this basis.

   Barlin also argues that Martin's testimony regarding an alleged Ponzi

scheme is unreliable because it lacks a sufficient factual foundation.  (Dkt. # 589 at

4–5.)  The Court finds this objection without merit.  Each factual assertion in

Martin's report is supported by a citation to a document obtained in discovery.

Martin does admit that he has made certain assumptions in the preparation of his

report, but asserts that all assumptions are based on the allegations set forth in

Plaintiffs' Complaint unless otherwise noted.  (Martin Report at 3.)

Finally, Barlin argues that Martin's testimony about Defendants' material[4] omissions must be excluded because it is not the product of reliable methodology.  Because Martin's testimony is non-scientific, the Court has considerable leeway in determining whether Martin's methodology is reliable. Kumho Tire Co., 526 U.S. at 150–52.  The Court finds that Martin's process of piecing together the relevant documents and identifying missing information and omissions is reliable.  Martin is certainly familiar with the process of investigating fraudulent transactions, having served for decades as a certified fraud examiner and Special Agent with the Internal Revenue Service in the intelligence and criminal investigations divisions.  (Martin Report at 2.)  For these reasons, the Court concludes that the proper course for challenging Martin's testimony regarding Defendants' alleged omissions is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." See Daubert, 509 U.S. at 596.

For the reasons stated above, the Court **GRANTS IN PART** Barlin's Motion to Exclude the Testimony of Edmond Martin (Dkt. # 598).  The Court excludes Martin's testimony regarding the "reasonable investor," but denies Barlin's Motion in all other respects.

---

[4] Again, the Court has already determined that Martin is not qualified to testify as to what a reasonable investor would consider material.

III.    Barlin's Motion to Exclude Testimony of John R. Fahy

        Finally, Barlin moves to exclude the testimony of John R. Fahy.  (Dkt. # 599.)  Fahy's testimony concerns the Temple Loan, the Manor Loan, and the Long Beach Loan, and his expert report contains three major conclusions: (1) the transactions in this matter constituted the "sale of securities" under the Securities Exchange Act of 1934 and the TSA, (2) Defendants acted as brokers and dealers as defined by the Securities Exchange Act of 1934 and the TSA, and (3) the sale of securities at issue were required to be registered with the Texas State Securities Board under Section 7 of the TSA.  ("Fahy Report," Dkt. # 599, Ex. A at 2–3.) Barlin moves to exclude Fahy's testimony on the grounds that it consists of legal conclusions and consequently is an improper subject of expert testimony.  (Dkt. # 599 at 1.)  Barlin also argues that Fahy's opinion that Defendants are sellers of securities is unreliable because it is based on an inaccurate legal definition. (Id. at 2.)

    A.    Legal Conclusions

        The Fifth Circuit has "consistently held that legal opinions are not a proper subject of expert testimony because they do not assist the trier of fact in understanding the evidence, instead merely telling the trier of fact what result to reach."  BNY Mellon, N.A. v. Affordable Holdings, Inc., No. 1:09CV226-SA-JAD, 2011 WL 2746301, at *1 (N.D. Miss. July 12, 2011) (collecting cases); see

also <u>Owen v. Kerr-McGee Corp.</u>, 698 F.2d 236, 240 (5th Cir. 1983) ("[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.").  As the Fifth Circuit has succinctly stated, "an expert may never render conclusions of law."  <u>Goodman v. Harris Cnty.</u>, 571 F.3d 388, 399 (5th Cir. 2009).

       Plaintiffs respond that Fahy's testimony does not consist of conclusions of law, but rather addresses legal matters involving questions of law and fact.  (Dkt. # 606 at 2–3.)  To the extent Plaintiffs argue that Fahy's testimony should be admissible under Texas evidentiary law because it addresses mixed questions of law and fact, Plaintiffs' argument clearly fails because the Texas laws of evidence do not apply to this case.  <u>See</u> <u>Stallion Heavy Haulers, LP v. Lincoln Gen. Ins. Co.</u>, No. SA-09-CA-0317-FB, 2011 WL 130154, at *2 (W.D. Tex. Jan. 13, 2011) (excluding expert testimony about mixed questions of law and fact because Texas evidence law does not apply to federal cases).

       In support of the proposition that experts may testify as to mixed questions of law and fact in federal court, Plaintiffs cite to <u>Huddleston v. Herman & MacLean</u>, 640 F.2d 534, 552 (5th Cir. Unit A 1981), <u>rev'd in part on other grounds by</u> 459 U.S. 375 (1983) and <u>S.E.C. v. U.S. Envt'l, Inc.</u>, No. 94Civ.6608(PLK)(AJP), 2002 WL 31323932, at *2 (S.D.N.Y Oct. 16, 2002). However, both of these cases are distinguishable from the instant case because they

discuss the propriety of allowing securities experts to testify as to ordinary practices within the securities industry.  Huddleston, 640 F.2d at 552 (holding that expert witness could testify as to whether statements in prospectus were standard language within the industry); U.S. Envt'l, 2002 WL 31323932, at *2 (permitting testimony of expert witness that "certain trading patterns would raise 'red flags'" and that "these trading patterns would have raised questions for an experienced trader").

    Here, in contrast, Fahy's conclusions amount to his application of the facts to the relevant securities laws, including the federal Securities Exchange Act of 1934 and the TSA.  Barlin aptly points out that his report reads much like a law review article on the merits of this case, and the Court finds that this testimony must be excluded as an improper rendering of legal conclusions.  See Owen, 698 F.2d at 240; Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 470–71 (S.D.N.Y. 2005) (excluding expert witness who opined that securities law had been violated based on the evidence provided).

  B. Reliablity

    Although the Court finds that Fahy's testimony should be excluded for the reasons explained above, the Court briefly addresses Barlin's second argument in favor of exclusion in order to clarify a point of law.  Barlin argues that Fahy's opinion regarding whether Defendants were "sellers" under the TSA must

be excluded because he formed his opinion in reliance on outdated case law.  (Dkt. # 599 at 5.)

Nearly sixty years ago in Brown v. Cole, the Texas Supreme Court held that under the TSA, "the seller may be any link in the chain of the selling process or in the words of the Act he is one who performs 'any act by which a sale is made.'"  291 S.W.2d 704, 708 (Tex. 1956).  The TSA has since been amended twice, in 1963 and 1977, and since then both state and federal courts in Texas have found that Brown v. Cole's broad definition of "seller" is no longer appropriate.  See In re Enron Corp. Sec., Derivative & ERISA Litig., 258 F. Supp. 2d 576, 603 (S.D. Tex. 2003); Frank v. Bear, Stearns & Co., 11 S.W.3d 380, 383 (Tex. App. 2000).  The post-1977 version of the TSA requires that a plaintiff must be in privity with a defendant in order to impose seller liability.  In re Enron, 258 F. Supp. 2d at 603; Frank, 11 S.W.3d at 383.

Under the current version of the statute, therefore, a "seller" is "the person who sold the security directly to the purchaser or who acted as the vendor's agent and solicited the sale."  In re Enron Corp. Sec., Derivative & ERISA Litig., 762 F. Supp. 2d 942, 974 (S.D. Tex. 2010); see generally In re Enron, 258 F. Supp. 2d at 603–08 (undertaking a comprehensive review of the history of the TSA, relevant Texas case law, and analogies to the federal provisions of the Uniform Securities Act of 1933 upon which the TSA was based).

For the reasons stated above, the Court **GRANTS** Barlin's Motion to Exclude the Testimony of John R. Fahy (Dkt. # 599).

IV.   <u>Plaintiffs' Motion to Exclude Testimony of Joyce Weedman</u>

Plaintiffs move to exclude the testimony of Joyce Weedman ("Weedman").  (Dkt. # 607.)  Weedman's report contains her conclusions on two discrete issues: (1) that Lahr and former Defendant Vitaly Zaretsky ("Zaretsky") had an objectively reasonable basis for concluding that the hard money loans being brokered by Lahr to Zaretsky's entity were sufficiently collateralized and would be repaid, and (2) that but for the economic downturn of 2008, the lien foreclosures likely could have been avoided and the hard money junior loans ultimately repaid. ("Weedman Report," Dkt. # 607, Ex. A at 1.)  Plaintiffs move to exclude Weedman's testimony on the grounds that (1) the subject matter of her expertise is not clear; (2) her opinions are based on personal experiences rather than on acquired knowledge or expertise, and (3) she employed no methodology, principles, or any criteria in arriving at her opinions.  (Dkt. # 607 at 1.)

A.   <u>Qualifications</u>

As explained above, a witness may be qualified as an expert if she possesses specialized knowledge, skill, experience, training, or education.  Fed. R. Evid. 702.  The inquiry is whether the witness's qualifications allow her to form a reliable opinion on a relevant issue.  <u>See</u> <u>Huss</u>, 571 F.3d at 455. "A district court

31

should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." <u>Wilson</u>, 163 F.3d at 937.  However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." <u>Huss,</u> 571 F.3d at 452.

          Plaintiffs' first two arguments in support of exclusion challenge Weedman's qualifications.  Weedman is a real estate broker who has been selling commercial land in the Austin, Texas area for 28 years.  (Weedman Report at 1; "Weedman Dep.," Dkt. # 607, Ex. B at 12:15–23.)  She participated in the sale of the Wildhorse Ranch.  (Weedman Report at 1.)  In her deposition, Weedman testified that her area of expertise is "limited to my assumption that the values of this—any part of this property were what contributed to those values at any given time and my history in this area talking to numerous developers and investors in this area from a period—time person that covered everything that happened here." (Weedman Dep. at 59:13–18.)  She further stated, "I'm an expert in what contributes to the value of land.  And what—what was the psychology and the activity in a ten-year period or more in this area specifically and why."  (<u>Id.</u> at 59:24–60:2.)  Weedman later clarified that she considers herself an expert mostly in the psychology of lenders, (<u>id.</u> at 60:16), although she also stated, "I'm not a

lender . . . I don't usually participate in that side of the conversations between a buyer and their lender other than having the lender call me and ask me questions. So I'm not an expert on that side."  (Id. at 61:16–20.)

The Court agrees with Barlin that Weedman's testimony is based not on actual knowledge of the financial health or wellbeing of the borrowing entity, but rather on the perceived market at the time the Manor Loan was made.  (Dkt. # 612 at 3; Weedman Dep. at 59:24–61:16, 77:11–79:9, 80:5–8.)  Weedman specifically stated in her deposition that her conclusions had nothing to do with the financial condition of the entity borrowing the loan, (Weedman Dep. at 80:5–8), and when asked how she could have reached her conclusions without any financial information about the entities involved, she responded, "[a]ll I'm looking at is the value of the dirt and the marketplace."  (Id. at 78:11–17.)  Weedman has no personal experience with hard money loans.  (Id. at 75:22–76:25.)  The Court therefore finds that while Weedman may be qualified to testify as to the general market conditions during the time period at issue, she is not qualified to testify as to her speculations about specific loans or transactions in which she did not personally participate.

B.     Methodology

Weedman's opinion is based on her general knowledge of the real estate market conditions during the time period at issue as well as her personal

experience as a real estate broker in the Austin, Texas area.  However, her report fails to provide the Court with any indication of the process by which she arrived at her conclusions.  Instead, it simply describes the market conditions and then abruptly arrives at its conclusions.  In the total absence of any indicia of methodology, the Court finds that Weedman's testimony must be excluded as unreliable.  See Fed. R. Evid. 702(c); Daubert, 509 U.S. at 592; Hebbler v. Turner, 2004 WL 414821, at *3 (E.D. La. Mar. 3, 2004) (excluding expert testimony of commercial real estate agent where expert's report did not reveal how she applied her expertise to the commercial lease in dispute).

For the reasons stated above, the Court **GRANTS** Plaintiffs' Motion to Exclude the Testimony of Joyce Weedman (Dkt. # 607.)

<u>CONCLUSION</u>

For the reasons stated above, the Court hereby (1) **GRANTS IN PART** Barlin's Motion to Exclude Untimely Disclosed Expert Testimony (Dkt. # 591), (2) **GRANTS IN PART** Barlin's Motion to Exclude Testimony of Edmond Martin (Dkt. # 589), (3) **GRANTS** Barlin's Motion to Exclude Testimony of John R. Fahy (Dkt. # 599), and (4) **GRANTS** Plaintiffs' Motion to Exclude Testimony of Joyce Weedman (Dkt. # 607.)

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, October 14, 2015.

_____
David Alan Ezra
Senior United States Distict Judge