UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STEVEN B. AUBREY and BRIAN E. VODICKA, | § § § | No. 1:10-CV-00076-DAE |
| Plaintiffs, | § § § | |
| vs. | § § | |
| PETER E. BARLIN, GREGORY H. LAHR, SANDRA F. GUNN, | § § § | |
| Defendants. | § § | |

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR
JUDGMENT AS A MATTER OF LAW

Before the Court are three Motions for Judgment as a Matter of Law (JMOL) filed by Peter Barlin, Gergory Lahr, and Sandra Gunn ("Defendants"). (Dkts. ## 674,675,676). The Court heard oral argument on the motions on January 27, 2016, where Anthony Icenogle appeared for Sandra Gunn and Gregory Lahr, Daniel Byrne appeared for Peter Barlin, and Brian Zimmerman and Nicholas Reisch appeared for Steve Aubrey and Brian Vodicka ("Plaintiffs"). On January 28, 2016, the Court issued its oral ruling on the motions. Upon careful consideration of the memoranda filed in support and opposition as well as the arguments presented at the hearing, the Court, for the reasons that follow **GRANTS IN PART** and **DENIES IN PART** *nunc pro tunc* the Motions for Judgment as a Matter of Law.

1

LEGAL STANDARD

Rule 50 states "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may resolve the issue against the party and grant a motion for judgment as a matter of law against the party on the claim or defense [under controlling law]."  Fed. R. Civ. P. 50.  In "entertaining a motion for judgment as a matter of law, the court should review all evidence in the record."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  A motion for judgment as a matter of law can be granted "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." Evans v. Ford Motor Co., 484 F.3d 329, 334 (5th Cir. 2007).

DISCUSSION

I.    Whether the Notes are Securities under the Texas Securities Act

Presented with the question whether certain demand notes issued by a Cooperative were securities under the Securities Exchange Act of 1934, the Supreme Court adopted the "family resemblance test" to determine whether a note is a security under the Act.  Reves v. Ernst & Young, 494 U.S. 56, 64-65 (1990) (adopting after considering (but not rejecting) the Fifth Circuit's "investment

2

versus commercial"[1] test, but noting that the two tests are different ways of formulating the same general approach).  Subsequently, the Fifth Circuit and Texas Courts of Appeal have used the "family resemblance test" to determine whether notes were a security.  Trust Co. of La. v. N.N.P. Inc., 104 F.3d 1478, 1489 (5th Cir. 1997) (applying the family-resemblance test to determine whether a note was a security under federal law); Grotjohn Precise Connexiones Intern., S.A. v. JEM Financial, Inc., 12 S.W.3d 859, 869 (Tex. App. 2000) (applying the family-resemblance test to determine whether a note was a security under the Texas Securities Act ("TSA")).  Since "the [TSA] is so similar to the federal Securities Exchange Act, Texas courts look to decisions of the federal courts to aid in the interpretation of the Texas Act."  See Searsy v. Comm. Trading Corp., 560 S.W.2d 637 (Tex. 1977).

The family-resemblance test begins with the language of the statute. Reves, 494 U.S. at 65.  Here, the Texas Security Act defines a "security" to include a "note".  Tex. Civ. Prac. & Rem. Ann. § 581-4(A).  Thus, the note is presumed a

---

[1] Defendants' rely exclusively on the "investment-commercial dichotomy" test. The Supreme Court's holding in Reves elected the "family resemblance" test as the appropriate framework over the "investment-commercial dichotomy" test, but noted that the two tests are generally the same and did not strike the "investment-commercial dichotomy" test as dead letter.  Therefore, the Fifth Circuit has never expressly overruled the use of the investment dichotomy test.  Indeed, while more recent Fifth Circuit opinions use the "family resemblance test," there are a handful of recent U.S. District Courts within the Fifth Circuit that have used the "investment-commercial dichotomy" test. See, e.g., Wolfe v. Bellos, No. 3:11-CV-02015-L, 2012 652090, at *7–8 (N.D. Tex. Feb. 28, 2012).

security, but may be rebutted with a showing that the note bears a strong

resemblance to notes previously held not to be securities by applying four factors.

Reves, 494 U.S. at 67; see also Grotjohn, 12 S.W.3d at 868.

Notes previously held not to be securities include: "(1) a note

delivered in consumer financing; (2) the note secured by a mortgage on a home;

(3) the short-term note secured by a lien on a small business or some of its assets;

(4) the note evidencing a 'character' loan to a bank customer; (5) short-term notes

secured by an assignment of account receivable; or (6) a note which simply

formalizes an open-account incurred in the ordinary course of business

(particularly if, as in the case of the customer of a broker, it is collateralized)."

Reves, 494 U.S. at 65 (quoting Exchange Nat. Bank of Chi. v. Touche Ross & Co.,

544 F.2d 1126, 1137 (2d Cir. 1976)).

A. First Factor

First, the Court must

> [E]xamine the transaction to assess the motivations that would prompt
> a reasonable seller and buyer to enter into it.  If the seller's purpose is
> to raise money for the general use of a business enterprise or to
> finance substantial investments and the buyer is interested primarily in
> the profit the note is expected to generate, the instrument is likely to
> be a "security.'"  If the note is exchanged to facilitate the purchase
> and sale of a minor asset or consumer good, to correct the seller's
> cash-flow difficulties, or to advance some other commercial or
> consumer purpose, on the other hand, the note is less sensibly
> described as a "security".

Reves, 494 U.S. at 66.

4

Plaintiffs have given testimony that their primary motivation in providing the loans was to make a profit on the high interest rate of each of the three loans.  Further, it is undisputed that the purpose behind the issuance of the three relevant notes was to secure loans to raise money for a general business enterprise and to finance substantial investments–namely an expansive commercial real estate development project (the Manor Loan) and improvements to real commercial property (Temple and Long Beach Loans).  As a result, the economic realities of these transactions indicate that the notes evinced an investment rather than a pure commercial or consumer transaction.  Id. at 68.  Accordingly, the Court finds that this factor weighs in favor of classifying the notes as a security.

B.  Second Factor

The second factor the Court must examine is the "'plan of distribution' of the instrument to determine whether it is an instrument in which there is common trading for speculation or investment." Reves, 494 U.S. at 66.

There has been no evidence that any of the three loans had a plan of distribution, were subject to common trading, or offered and sold to a broad segment of the public.  See Id. at 68 (finding a plan of distribution existed for a note despite not being traded on an exchange because the notes were extended to 23,000 members and 1,300 people held the notes upon foreclosure); Bailey v. State, No. 08-02-00423-CR, 2008 WL 1914270, at * 3 (Tex. App. May 1, 2008)

(finding a plan of distribution to exist for a CD that was advertised in a newspaper causing many people to contact the lendee).  Further, Plaintiffs have not offered any evidence that these notes were offered to a large segment of the population. Indeed, there is no proof or even allegation that a secondary market existed for these loans or that Plaintiffs provided the loans in order to re-sell the notes on a speculative market.  See Nat'l Bank of Yugoslavia v. Drexel Burnham Lambert, Inc., 768 F. Supp. 1010, 1015 (S.D.N.Y.).

However, "[a] debt instrument may be distributed to but one investor, yet still be a security." Trust Co of La., 104 F.3d at 1489.  Multiple circuits have noted that while a small number of investors does not constitute a "broad segment of the public," that is not the end of the analysis.  Stoiber v. S.E.C., 161 F.3d 745, 751 (D.C. Cir. 1998) (stating thirteen customers with whom the defendant had a personal relationship did not constitute a broad segment of the public, but nonetheless found common trading); McNabb v. S.E.C., 298 F.3d 1126, 1132 (9th Cir. 2002) (holding that ten notes issued to six individuals did not constitute a broad segment of the public, but that common trading existed).  Key to the analysis conducted in the D.C. and Ninth Circuit was a weighing of the need of the protections of the securities act.  In Stoiber, the court found common trading to exist because the defendant solicited thirteen individuals, not sophisticated institutions.  Stoiber, 161 F.3d at 751 ("Stoiber solicited individuals, not

sophisticated institutions.  While his solicitations included individual presentations,

he offered customers little detail.")  In <u>McNabb</u>, the Ninth Circuit found that a

court must weigh the fact that a small number of individuals does not constitute a

broad segment of the public against the purchasing individual's need for the

protection of the securities act.  <u>McNabb</u>, 298 F.3d at 1132.  Here, Plaintiffs are

not institutions and thus more likely to require the protections of the TSA.

However, both Plaintiffs have testified about their degrees in law, business, and

finance, sophisticated understanding of investments, and actual experience with

similar investments and businesses at issue in this trial.  Accordingly, the Court

finds that Plaintiffs need for protection from the TSA is at its lowest ebb.

Therefore, the Court finds that the second factor weighs against the notes being

classified as a security because they were not offered to a broad segment of the

public, they were not commonly traded, Plaintiffs have not given testimony that

they intended to trade the notes on a secondary market, and Plaintiffs are

sophisticated and experienced investors who did not necessarily require the

protections of the TSA.

      C.  <u>Third Factor</u>

      The Court must also examine "the reasonable expectation of the

investing public."  <u>Reves</u>, 494 U.S. at 69.  The Court should consider instruments

to be "securities" on the basis of the public's reasonable expectations, even where

"an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." Id. The Supreme Court notes they "have consistently identified the fundamental essence of a 'security' to be its character as an 'investment'." Id. at 68-69.

Here, the testimony appears undisputed that Plaintiffs considered these loans to be investments and that the promoters and issuers characterized the loans as investments to Plaintiffs. Indeed, upon review of the Long Beach and Temple Notes, express language on the face of the notes described them as investments. The Reves Court made clear that the fundamental essence of a security is its character as an investment, and here the notes, both on their face and in their advertisement, have an investment character. See Delgado v. Ctr. On Children, Inc., No. 10-2753, 2012 WL 2878622, at * 5 (E.D. La. Jul. 13, 2012) (finding a note a security because the defendant advertised the note as an investment and the note described that instrument as an investment).

Accordingly, the Court finds that the fundamental character of these notes was that of an investment. The promoters and issuers characterized the loans as investments to Plaintiffs and the language on the notes references them as investments. Therefore, the third factor weighs in favor of the notes being a security.

D. Fourth Factor

The fourth factor considers risk-reducing factors.  The Reves Court indicated that the existence of a regulatory scheme, collateralization, and insurance are relevant risk-reducing factors.  Reves, 494 U.S at 69.

Parties do not cite to the existence of a regulatory scheme that might reduce the risk of the instrument, although Texas creditor and debtor laws provide a certain level of protection for Plaintiffs against the lendee.  There is also no evidence that Plaintiffs' notes were insured.  However, the notes were collateralized and that is a risk reducing factor weighing against the note being a security.  Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1539 (10th Cir. 1993) (holding that the existence of collateral is a risk-reducing factor that favors finding the note not a security).  Accordingly, the Court finds that the risk-reducing factors are neutral in the determination whether the notes are securities.

In Reves, the Supreme Court held that there is a presumption notes are securities.  Reves, 494 U.S. at 67.  Here, the Court finds that the first and third factors strongly indicate that the notes are securities due to the motivations of the interested parties, the nature of the transactions, and the investment character of each note.  While the second factor does not weigh in favor of classifying the relevant notes as a "security," the factor alone is not sufficient to overcome the

9

presumption.  Therefore, the Court finds that all three loans in this case are securities and thus subject to the TSA.

II.     Issuer Exemption

The TSA requires securities to be registered, and creates liability for persons who sell a security where the seller and security are not registered under the TSA.  Tex. Rev. Civ. Stat. Ann. § 581-33(A)(1).  However, certain exemptions may apply.  See Tex. Civ. Prac. & Rem. Ann. § 581-5.  Relevant to this case, the statute states:

> [T]he provisions of [the TSA] shall not apply to any sale, offer for sale, solicitation, subscription, dealing in or delivery of any security under any of the following transactions or conditions:
>
> I. Provided such sale is made without any public solicitation or advertisements:
>
> (a) the sale of any security by the issuer thereof so long as the total number of security holders of the issuer thereof does not exceed thirty-five (35) persons after taking such sale into account

Tex. Civ. Prac. & Rem. Ann. § 581-5(I)(a).

The question before the Court is whether the exemption applies only to the sale of a security by an issuer or whether the exemption applies to sales of a security of an issuer by a third-party unregistered dealer when the sale is made without public solicitation and to less than 35 persons.

When courts in the Fifth Circuit interpret a Texas statute, the court "follow[s] the same rules of construction that a Texas court would

10

apply–and under Texas law the starting point of our analysis is the plain language of the statute." Wright v. Ford Motor Co., 508 F.3d 263, 269 (5th Cir. 2007).  The Texas Supreme Court stresses that "stray[ing] from the plain language of a statute . . . risk[s] encroaching on the Legislature's function to decide what the law should be." Id. (quoting Fitzgerald v. Advanced Spine Fixation Sys., Inc., 996 S.W.2d 864, 866 (Tex. 1999)). However, the Texas Supreme Court has recently explained that "[i]f an as-written statute leads to patently nonsensical results, the 'absurdity doctrine' comes into play, but the bar for reworking the words our Legislature passed into law is high." Combs v. Health Care Servs. Corp., 401 S.W.3d 623, 630 (Tex. 2013).  Indeed, "the absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity." Id.

        Here, the statutory language is clear: "the provisions of the [TSA] shall not apply to any sale . . . under any of the following transactions or conditions: 'the sale of any security by the issuer'" provided the sale is made without public solicitation or advertisements.  Tex. Civ. Prac. & Rem. Ann. § 581-5(I)(a).  The language is unambiguous that the exemption applies only to all non-public sales by an issuer.  Further, the Texas legislature specifically defined the meaning of an issuer, a broker, and a dealer within the TSA.  See Tex. Civ. Prac & Rem. Ann. § 581-4.  These

11

statutory definitions convince this Court that the legislature meant the

exemption to only apply to non-public sales by issuers and not to other

dealers, brokers, or third-party agents.

   Indeed, this is how the Texas State Securities Board ("the Board") has

interpreted the exemption.  On the Board's public website, they announce that the

exemption at issue here is "available only to the issuer of the securities."  Texas

State Securities Board, <u>Exemptions from Registration</u>, (Jan. 28, 2015, 10:32 AM),

<u>https://www.ssb.texas.gov/securities-professionals/regulation-</u>

<u>securities/exemptions-registration</u>.  Further, the Board has determined that the

issuer exemption does extend to "owners, officers, or directors" acting on the

behalf of issuers if three important criteria are met: (1) the person cannot have been

hired for the purpose of offering or selling the securities; (2) any securities

activities of the person must be incidental to his or her bona fide primary

nonsecurities-related work duties; (3) the person's compensation must be based

entirely on that person's nonsecurities-related duties.  <u>Id.</u>

   Here, it is undisputed that no Defendant is an issuer under the Act.

Since no Defendant is an issuer, the plain meaning of the TSA dictates they may

not rely on the issuer exemption.  Even if Defendants were somehow defined as

officers of J&T Development or another issuer, the issuer exemption would not

apply to them under the Board's interpretation, because they received compensation based on a securities-related duty.

Defendants ask the Court to invoke the absurdity doctrine in its interpretation of the issuer exemption. Defendants argue that a plain interpretation of the issuer exemption results "in the absurd result that a seller would be liable for the sale of a non-registered security that the issuer would be exempt from registering." (Dkt. # 672 ¶ 11.) As the Court noted before, the absurdity doctrine is a "safety valve" reserved for truly exceptional cases. In all cases, this high bar is necessary due to the natural separation of powers concerns present in any statutory interpretation matter. Yet, here, that bar is far higher due to the federalism concerns present where a federal court is being asked to find an absurd result in state legislation. The Texas Supreme Court has explained that "statutes, framed in general terms, can often work peculiar outcomes, including over or under-inclusiveness, but such minor deviations do not detract from the statute's clear import." Combs, 401 S.W.3d at 630. Indeed, "pointing out a quirky application is quite different from proving it was quite impossible that a rationale legislature could have intended it." Id. Here, the issuer exemption is under-inclusive in the sense that it does not cover sellers who might sell an issuer's non-exempt security. However, the Court finds that this minor deviation or quirky application does not

detract from the clear import of the TSA's plain meaning–namely, to exempt small scale, non-public securities sold directly from an issuer.

Accordingly, the Court finds that Defendants are not issuers and thus may not rely on the § 5(I)(A) issuer exemption as a defense.

III.   Defendant Barlin's Motion for JMOL

A. Barlin as a Seller

On October 14, 2015, this Court issued an Order on the parties' Daubert motions.  (Dkt. # 624.)  In that Order, the Court held

> Nearly sixty years ago in Brown v. Cole, the Texas Supreme Court held that under the TSA, "the seller may be any link in the chain of the selling process or in the words of the Act he is one who performs 'any act by which a sale is made.'"  291 S.W.2d 704, 708 (Tex. 1956). The TSA has since been amended twice, in 1963 and 1977, and since then both state and federal courts in Texas have found that Brown v. Cole's broad definition of "seller" is no longer appropriate. See In re Enron Corp. Sec., Derivative & ERISA Litig., 258 F.Supp.2d 576, 603 (S.D. Tex.2003); Frank v. Bear, Stearns & Co., 11 S.W.3d 380, 383 (Tex.App. 2000). The post–1977 version of the TSA requires that a plaintiff must be in privity with a defendant in order to impose seller liability.  In re Enron, 258 F.Supp.2d at 603; Frank, 11 S.W.3d at 383.
>
> Under the current version of the statute, therefore, a "seller" is "the person who sold the security directly to the purchaser or who acted as the vendor's agent and solicited the sale." In re Enron Corp. Sec., Derivative & ERISA Litig., 762 F.Supp.2d 942, 974 (S.D. Tex. 2010); see generally In re Enron, 258 F.Supp.2d at 603–08 (undertaking a comprehensive review of the history of the TSA, relevant Texas case law, and analogies to the federal provisions of the Uniform Securities Act of 1933 upon which the TSA was based).

Aubrey v. Barlin, No. 1:10-cv-76-DAE, 2015 WL 6002260, at *13 (W.D.
Tex. Oct. 14, 2015).

   Here, Plaintiffs allege that Barlin was a seller of the Manor
Loan, Temple Loan, and Long Beach Loan.  Throughout their case-in-chief,
Plaintiffs had the opportunity to present evidence that Barlin was a seller of
the Temple and Long Beach loans as the Court defined that term in its
Daubert Order.  After considering the evidence and without making any
credibility determinations, the Court finds that the evidence is of a such
quality and weight that reasonable and fair-minded people could not reach
any other conclusion but that Barlin was not a seller of the Temple and Long
Beach Loans.

   Accordingly, the Court grants Barlin's Motion for Judgment as a
Matter of Law on the issue of whether he was a seller of the Temple and
Long Beach Loan under the TSA.

  B. <u>Secondary Liability for Barlin</u>

   Secondary liability under the TSA imposes joint and several liability
on a "control person" and one who "aids and abets" a primary violator.  <u>See</u> Tex.
Civ. Prac. & Rem. § 581-33(F).  The TSA defines a control person as one who
"directly or indirectly controls a seller, buyer, or issuer of a security." Tex. Civ.
Prac. & Rem. § 581-33(F)(1).  A control person is one who "had actual power or

influence over the controlled person and (2) induced or participated in the alleged violation. Barnes v. SWS Financial Servs., Inc., 97 S.W.3d 759, 763 (Tex. App. 2003). The TSA defines an aider and abettor as "a person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security. Tex. Civ. Prac. & Rem. § 581-33(F)(2). Texas courts state a plaintiff must show the following: (1) that a primary violation of the securities laws occurred; (2) that the alleged aider had "general awareness" of its role in this violation; (3) that the actor rendered "substantial assistance" in this violation; and (4) that the alleged aider either (a) intended to deceive plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator. Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc., No. 03-09-00566-CV, 2011 WL2769838, at * 13 (Tex. App. Jul. 12 2011) (quoting Frank v. Bear, Stearns & Co., 11 S.W.3d 380, 384 (Tex. App. 2000)).

      Here, the evidence is of a quality and weight that reasonable and fair-minded people could not reach any other conclusion that Barlin was not a control person or an aider and abettor with respect to the Temple and Long Beach loans. However, Plaintiffs have offered evidence that raises a genuine question of fact about Barlin's role as a control person or aider-and-abettor for the Manor Loan. Specifically, Barlin's approximately $1,000,000 loan to Lahr purportedly for the

Manor Loan (Pls. Ex. 50) and a $20,000 commission check for Manor (Pls. Ex. 13) raises a question of fact about his involvement with that security along with the testimony of Plaintiff Vodicka.  Accordingly, the Court **GRANTS** Barlin's motion for JMOL as to his secondary liability for the Temple and Long Beach Loans. The Court **DENIES** Barlin's Motion for JMOL as to his secondary liability for the Manor loan.

    IV.    <u>Lahr and Gunn's Motion for Judgment as a Matter of Law</u>

        A.  <u>Informal Creation of a Fiduciary Duty</u>

        Where a formal fiduciary relationship does not arise between the parties, "the Texas Supreme Court has 'recognized that in some circumstances a special relationship of trust may arise between parties prior to and independent from the parties' business relationship, which can give rise to informal fiduciary duties.'" <u>N. Tex. Opportunity Fund L.P. v. Hammerman & Gainer Intern., Inc.</u>, 107 F. Supp. 3d 620, 637 (N.D. Tex. 2015) (quoting <u>Ritchie v. Rupe</u>, 443 S.W.3d 856, 889 n. 58 (Tex. 2014)).  This informal fiduciary duty "aris[es] from 'a moral, social, domestic or purely personal relationship of trust and confidence.'" <u>Meyer v. Cathey</u>, 167 S.W.3d 327, 331 (Tex. 2005) (quoting <u>Associated Indem. Corp. v. CAT Contracting, Inc.</u>, 964 S.W.2d 276, 287 (Tex. 1998)).  However, "not every relationship involving a high degree of trust and confidence rises to the stature of a formal fiduciary relationship." <u>Bazan v. Munoz</u>, 444 S.W.3d 110, 118 (Tex. App.

2014) (quoting <u>Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.</u>, 823
S.W.3d 591, 594 (Tex. 1992)).

   The standard for the formation of an informal fiduciary relationship is
high, and courts "do not create such a relationship lightly." <u>Meyer</u>, 167 S.W. 3d at
331 (quoting <u>Schlumberger Tech. Corp. v. Swanson</u>, 959 S.W.2d 171, 176 (Tex.
1997)). Texas courts very consistently require that a special relationship of trust
and confidence must exist *prior to* and *apart from* the agreement that formed the
basis of the suit. <u>Meyer</u>, 167 S.W.3d at 331. Specifically, prior arms-length
transactions between the parties—those transactions that are entered into for the
independent benefit of each party—do not create a basis for a fiduciary
relationship. <u>Meyer</u>, 167 S.W.3d at 331 (citing <u>Associated Indem. Corp.</u>, 964
S.W.2d at 288 (finding that the existence of a contractual indemnity agreement,
which "was an arms-length transaction entered into for the parties' mutual
benefit," and was entered into without the existence of prior dealings between the
parties "justifying a special relationship of trust and confidence," was insufficient
to justify the creation of an informal fiduciary duty).

   Here, the evidence is of a quality and weight that reasonable
and fair-minded people could not reach any other conclusion but that Lahr
and Gunn owed no fiduciary duty to Plaintiffs through their informal
relationships. The evidence indicates that no relevant relationship existed

between the Plaintiffs with Lahr and Gunn prior to the transactions at issue.

Meyer, 167 S.W.3d at 331 ("To impose an informal fiduciary duty in a

business transaction, the special relationship of trust and confidence must

exist prior to, and apart from, the agreement made the basis of the suit.")

Based on the evidence, a reasonable jury could only conclude that the

relationships arose through arms-length business transactions entered into

for the benefit of both parties.  Such relationships do not give rise to a

fiduciary duty.

   B. Formal Creation of a Fiduciary Duty

         "In formal fiduciary relationships, such as attorney-client, partnership,

and trustee relationships, fiduciary duties arise as a matter of law."  Bazan v.

Munoz, 444 S.W.3d 110, 118 (Tex. App. 2014).  Formal fiduciary relationships,

"such as an attorney-client or trustee relationship . . . arise[ ] as a matter of law."

Meyer, 167 S.W.3d at 330; see also Heritage Gulf Coast Prop., Ltd. V.

Sandalwood Apartments, Inc., 416 S.W.3d 642, 650 (Tex.App. 2013).  Further,

"[t]he relationship between a broker and its customer is that of principal and

agent."  Rauscher Pierce Refsnes, Inc. v. Great Southwest Sav., F.A., 923 S.W.2d

112, 116 (Tex. App. 1996) (citing Magnum Corp. v. Lehman Bros. Kuhn Loeb,

Inc., 794 F.2d 198, 200 (5th Cir. 1986).  Such a relationship would legally give rise

to a fiduciary duty, especially in the context where a broker is selling a security to

a customer.  Romano v. Merrill Lynch, Pierce, Fenner, & Smith, 834 F.2d 523, 530

(5th Cir. 1987).  However, "if a broker'[s] . . . duty consists merely of bringing the

parties together so that, between themselves, they may negotiate a sale, and the

sale is made in that manner, the broker is considered a mere 'middleman' and is

not necessarily the 'agent' of either party."  Rauscher, 923 S.W.2d at 115.

   Here, questions of fact exist as to whether Lahr was Plaintiffs' broker-

agent for the securities at issue and if he was as to the scope of that relationship.

Further, questions of fact exist as to whether Lahr was simply a middleman who

connected Plaintiffs with Vitaly Zaretsky and the other note issuers or if Lahr was

indeed Plaintiffs' agent.  Coleman v. Klockner & Co. AG, 180 S.W.3d 577, 587

(Tex. App. 2005) ("The question of whether an agency relationship exists is

generally a question of fact.")  However, the same cannot be said for Gunn.

Indeed, Plaintiffs concede that Gunn had nothing to do with the Long Beach Loan.

The evidence shows that Defendant Gunn was an officer of Creative Financial

Services (CFS), a non-party to this suit, an organization that, *inter alia*, apparently

brokered private financing for real estate development.  The Court finds that the

evidence attributing any agency relationship between Gunn, in her personal

capacity, with Plaintiffs is of a quality and weight that reasonable and fair-minded

people could not reach any other conclusion that Gunn was not Plaintiffs' agent

and thus did not owe Plaintiffs a fiduciary duty.

V.   <u>Defendants' Duty of Care</u>

On June 6, 2012, the Texas Court of Appeals rendered an opinion affirming a Texas district court's valid final judgment that dismissed with prejudice Plaintiffs' negligence claims against Defendants.  <u>Vodicka v. Lahr</u>, No. 03-10-00126-CV, 2012 WL 2075713, at * 2 (Tex. App. June 6, 2012).  The Texas courts held that Defendants owed no duty of care to these Plaintiffs.  Barlin asserts collateral estoppel in the form of an objection to a jury question about gross negligence.  (Dkt. # 668 at 37.)

*Res judicata*, or claim preclusion, treats a final valid judgment as the full measure of relief accorded between the parties on that claim.  <u>St. Paul Mercury, Ins. Co. v. Williamson</u>, 224 F.3d 425, 436 (5th Cir. 2000).  The test for *res judicata* has four elements: (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions.  <u>Test Masters Educ. Servs., Inc. v. Singh</u>, 428 F.3d 559, 571 (5th Cir. 2005).

Here, all elements are met.  The parties to the state court action are identical to the parties in this federal lawsuit.  The judgment entered in the previous lawsuit was entered by a Texas district court with jurisdiction and the action concluded with a valid final judgment that dismissed the negligence claims

21

against Lahr, Gunn, and Barlin with prejudice.  See Vodicka, 2012 WL 2075713 at

1−2.  Accordingly, Plaintiffs are collaterally estopped from bringing a negligence

claim against Defendants.

   "A finding of ordinary negligence is a prerequisite to a finding of

gross negligence."  Dewayne Rogers Logging, Inc. v. Propac Indus., 299 S.W.3d

374, 385 (Tex. App. 2009).  Since a state court of competent jurisdiction has

rendered a valid final judgment on the merits finding Defendants owed no duty of

care to Plaintiffs, Defendants cannot be found negligent and by extension cannot

be found grossly negligent.  Therefore, the jury will not receive a question to

decide whether Defendants were grossly negligent.

<u>CONCLUSION</u>

   For all other claims, the Court finds that genuine issues of material

fact exist so that a reasonable and fair-minded jury could find Defendants liable.

Accordingly, for reasons stated above, the Court **GRANTS IN PART** and

**DENIES IN PART** Defendant Peter Barlin's Motion for Judgment as a Matter of

Law,  (dkt. # 674), **DENIES** Defendant Lahr's Motion for Judgment as a Matter of

Law (dkt. # 675), and **GRANTS IN PART** and **DENIES IN PART** Defendant

Gunn's Motion for Judgment as a Matter of Law.  (Dkt. # 676.)

   **IT IS ORDERED**

**IT IS FURTHER ORDERED** that Plaintiffs' oral motion to amend their pleadings to include a claim for conspiracy is **GRANTED**.

**DATED:** February 1, 2016, Austin, Texas.

_____

DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE